Per Curiam:
This case was referred pursuant to Rule 57(a) to Trial Commissioner C. Murray Bernhardt, with directions to make findings of fact and recommendation for conclusions of law. .The commissioner has done so in an opinion and report filed on March 5, 1965. Exceptions to the commissioner’s report were filed by the parties. The parties have filed briefs and the case has been argued orally. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and their petition is dismissed.
Commissioner Bernhardt’s opinion, as modified by the court, is as follows:
This is the latest in a succession of security guard claims for overtime pay under section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1958), involving a common pattern of preshift overtime duties against a Government offset for meal periods.
These six plaintiffs were ship maintenance mechanics (a euphemism for guards) at the New York Naval Shipyard in Brooklyn, New York, during the claim period of July 18, 1957 to February 9,1959, claims for earlier time-barred periods not having been made. Plaintiffs with others provided an around-the-clock guard vigil against fire and other contingencies on ships being repaired or constructed at the Shipyard. With some variations governed by the nature ox the *1255 protected sbip, guards were posted at the gangway entrances and exits, and at a booth, on each, ship containing a telephone, fireboard, log, etc., and on roving patrols through the ships. Each man was employed eight hours daily, five days per week. Three eight-hour shifts were rotated, commencing at 7:30 a.m., 3:30 p.m., and 11:30 p.m. , Incoming guards punched timecards at the entrance gates and deposited them at the muster building, where they changed into working-attire and assembled their necessary tools and paraphernalia. They were then driven in a group by truck to their assigned posts to relieve the outgoing guards, from whom special instructions were passed on. The outgoing guards were then returned by truck to the muster area, where they were required to remain until shift end.
Had the incoming guards reported to work on the dot at the beginning of their eight-hour shift, it would not have been possible for them to accomplish the required preliminaries in time to reach and relieve the outgoing guards for the latter to arrive at the muster building by the quitting hour. In recognition of this impossibility a written regulation was posted in 1948 requiring all guards to arrive at the muster area 30 minutes prior to the commencement of their shift, thus permitting timely relief of the outgoing guards. Continuous security was vital. The posted notice was removed after 30 days, but throughout all ensuing years the guards obeyed verbal orders to the same effect. Mr. Harry O’Connor, plaintiffs’ immediate supervisor since 1951, knew of these verbal orders and did not countermand them. Nor did his superior, the Master of the Shops, a Mr. Sidman, who was aware of the early reporting practice through inspection of the logbooks, if not otherwise. Continuation of the overtime system was indispensable to performance of their security responsibilities as supervisors, as it was to uninterrupted surveillance. Occasional breach of the requirement was the subject of verbal reprimand.
In October 1955.the Production Department, under whose general supervision the guards had been since 1950, published an overtime regulation quoted in finding 9, requiring formal written approval of overtime in advance by listed *1256 Shipyard officials or their designated representatives. The regulation required “Masters and Senior Civilian Supervisors”, which Messrs. O’Connor and Sidman presumably were, to submit overtime requests for authorization and approval. They never did so, nor did plaintiffs ask them to.
At this juncture the question is whether the overtime was officially ordered and approved in the sense required by the governing statute for recovery. Unlike the guards in Albright, et al., v. United States, 161 Ct. Cl. 356 (1963), who were denied recovery for a small portion of their overtime because their authorized superiors “tacitly expected” them to provide it without compensation rather than affirmatively ordering them to do so, the present plaintiffs were verbally ordered to perform the overtime, and the defense lies in the imperfection of the order. The particular imperfection is that, rather than being ordered and approved in writing by those named in the Shipyard regulation as being authorized to order and approve overtime, the overtime here was ordered verbally and enforced over 11 years by supervisory personnel lacking authority under the regulation, and without the proven knowledge of those who possessed the authority. Similar but not identical problems confronted the court in Tabbutt, et al., v. United States, 121 Ct. Cl. 495 (1952) and Gray v. United States, 136 Ct. Cl. 312 (1956). In Tabbutt investigators in the Alcohol & Tobacco Tax Division of the Treasury Department were denied overtime compensation ordered by their immediate supervisors because the only officials authorized by departmental regulation to approve overtime had not done so. The same result was obtained in the Gray case even though the Commissioner of Narcotics, who was the officer designated by regulation to approve overtime, had knowledge of the overtime being served by the narcotic agent plaintiff, but did not order nor induce the overtime directly or indirectly. However, in the month following the Gray decision the court in Anderson, et al., v. United States, 136 Ct. Cl. 365, 142 F. Supp. 902 (1956) held that Customs Border Patrol inspectors were entitled to compensation for overtime which, while not ordered by the responsible officer, the Commissioner of Customs, was in *1257 duced by that official. On the strength of the Tabbutt decision the court in Gaines v. United States, 132 Ct. Cl. 408, 131 F. Supp. 925 (1955), held that “Absent the written authorization or approval as required by the statute and regulations, plaintiff [an aviation safety agent for the Civil Aeronautics Administration] is not entitled to recover.”, although there was an unresolved question as to whether even the plaintiff’s immediate supervisor ordered him to perform overtime. Bantom, et al., v. United States, 165 Ct. Cl. 312 (1964), cert, denied 379 U.S. 890, is relied upon by defendant as support for the general proposition voiced in the Tdbbutt and Gaines cases, but the facts make it inapposite.
Against these the plaintiff cites Byrnes, et al., v. United States, 163 Ct. Cl. 167, 330 F. 2d 986 (1963), which held investigators for the Alcohol & Tobacco Tax Division of the Treasury Department entitled to compensation for overtime performed “with the full knowledge, encouragement and inducement” of the officials authorized to order overtime, but without their formal order. And in Adams, et al., v. United States, 162 Ct. Cl. 766 (1963), it was held that immigration patrol inspectors were entitled to compensation for overtime performed at the direction of the Commissioner of Immigration and Naturalization, even though the pertinent regulation required approval by higher officials of the Department of Justice, on the grounds that the regulation was unreasonable.
The common denominator derived from these results is that a regulation requiring approval of overtime by a designated official before it can be paid is binding on claimants unless the regulation is unreasonable or the official who has withheld formal written approval has nevertheless actively induced and encouraged the overtime. Mere knowledge on his part, without affirmative inducement or written sanction, would not seem to be sufficient. The present plaintiffs clearly do not fit into either of the stated exceptions, for the Shipyard regulation governing their overtime was not unreasonable and there is no proof that the officials designated by the regulation to authorize overtime were even aware that it was being performed, much less participating or *1258 otherwise contributing to the practice. A possible distinction lies in the wording of paragraph 5 of the Shipyard regulation which, in establishing procedures for authorization of overtime, “requires” Masters and Senior Civilian Supervisors to submit overtime requests to obtain authorization for overtime work. It could be argued that the failure on the part of plaintiffs’ immediate supervisors to submit their overtime claims to authorized, officials, after tolerating and encouraging such overtime over an 11-year period, is such a breach of duty as to impute its consequences to the authorized officials and thus put the latter in the position of having induced the overtime, as indeed the immediate supervisors had done. However, the force of such an argument is dissipated by the failure of the plaintiffs to formally demand their immediate supervisors to take such action and carry their claims to authorized officials. Administrative efficiency requires observance of orderly forms, and by voicing their demands through proper channels the plaintiffs conceivably could have secured a ruling which would have resulted either in an order for overtime compensation or in a justified refusal on the part of the plaintiffs to continue performing overtime work without compensation.
In view of this disposition it is unnecessary to treat other issues presented by the parties.
FiNdings of Fact
1. Plaintiffs, citizens of the United States, are six former civilian employees of the New York Naval Shipyard, Brooklyn, New York. Each plaintiff was employed as a ship maintenance mechanic during the period July 18, 1957 to February 9,1959.
2. Plaintiffs seek to recover overtime compensation for the period July 18,1957 to February 9, 1959, which falls within the six years preceding the filing of the petition, pursuant to the provision of section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. .§ 911 (1958). The petition was filed July 18,1963.
*1259 As basis for the claims, plaintiffs allege they were required to report to work 30 minutes prior to the commencement of each eight-hour tour of duty. Defendant denies plaintiffs are entitled to overtime compensation. However, in the event plaintiffs succeed, defendant seeks to offset the 30 minutes of overtime work by showing that each plaintiff had 20 minutes for lunch each day and 20 minutes of free time spent in the muster area at the expiration of his tour of duty for which he was compensated, but performed no compensable services.
3. The United States Naval Shipyard is located in Brooklyn, New York. It occupies a large area on which are located various buildings, shops, water areas, piers and dry-docks. The primary function of the Shipyard is ship maintenance and construction for the Navy. Civilian and military personnel were used for an around-the-clock security force. The base gates were manned by United States Marines, a civilian police force patrolled the grounds, and the maintenance mechanics guarded, and performed some maintenance on, ships being repaired or constructed at the yard.
4. Originally, the ship maintenance mechanics were part of the Civilian Police Department of the Shipyard. In 1950 the maintenance mechanics were placed under the general supervision of the Production Department. During the period 1951 through 1959 all of the maintenance mechanics were under the direct supervision of Mr. Harry O’Connor.
5. The duties of the ship maintenance mechanics are to keep all unauthorized personnel from boarding ships under construction or repair, to check the draft, mooring lines, compartments, steam rooms and various other portions of the ship for fire hazards, leaks, or other dangerous or emergency situations. The maintenance mechanics were given various posts to man. The gangway, the means of ingress and egress to and from the ship, and a booth on the ship where a telephone, fireboard and log were located, had to be manned at all times.
6. At all times material herein, the maintenance mechanics were employed on the basis of a five-day week, eight-hour day. They operated on the basis of three eight-hour shifts *1260 per 24-hour period. The shifts were from 7:30 a.m., to 3:30 p.m., 3:30 p.m., to 11:30 p.m., and 11:30 p.m., to 7:30 a.m.
Prior to and during the period July 18, 1957 to February 9, 1959, the maintenance mechanics were required to report for duty 30 minutes before the commencement of their shift so that the prior shift could be relieved of their posts and returned to the mustering area before termination of their tour of duty. It was also necessary for the outgoing shift to instruct the incoming one about any special condition or duties that had to be performed. Reporting early permitted the required continuous watch on board the various ships and was necessary to the proper functioning of the security program.
7. On arriving at the Shipyard plaintiffs would punch their time cards at the gate entered, proceed to the muster building, place their time cards on the supervisor’s desk and, if they desired, change into work clothing. During muster, each man was checked to make sure he had his logbook, pencils, spanner wrench, and other tools necessary for the job. When a full complement was assembled, or in any ©vent at least 30 minutes prior to their shift, their supervisor would order them into a truck, drive to the appropriate post, and wait in the vehicle at each post while the oncoming shift received instructions from the shift going off duty.[1] The supervisor would then proceed, with the relieved shift, to the next post. When all of the outgoing shift was relieved, the supervisor would drive them back to the muster area. At the muster area the outgoing shift was required to wait until the conclusion of their scheduled eight-hour shift, namely, 3:30 p.m., 11:30 p.m., and 7:30 a.m. The men had no duties to perform during the time, but they could not leave the muster building.
8. Sometime during 1948, prior to the time the mechanics came under the jurisdiction of O’Connor, a written regulation was issued requiring all maintenance mechanics to report *1261 to their muster area 30 minutes prior to the commencement of their shift. The mechanics were required to read and initial the order and it remained posted about 30 days and then removed. Also, verbal orders were given to the maintenance mechanics to report to their muster area for duty 30 minutes prior to the commencement of their shift. Mr. O’Connor knew of the verbal orders and that the men were required to report, and were reporting, one-half hour prior to the commencement of their shifts. He did not countermand those orders because he would have been unable to have a continuous watch without these employees working 30 minutes overtime each day. On occasion he heard the men reprimanded for failing to report one-half hour before their tour of duty began. Mr. Sidman, O’Connor’s immediate supervisor, also inspected the logs which showed plaintiffs were working one-half hour overtime.
9. On October 26, 1955, the Production Department promulgated a written regulation calling for strict control of overtime. The relevant portion of the regulation provided:
4. General.
a. Overtime work for Production Department employees must, in all cases, be authorized by written approval on Form 3ND-NYNS-GEN-25a (Rev. 11-54). Such written approval shall normally be obtained in advance of the actual overtime work. In urgent cases where time will not permit written approval in advance, verbal approval may be obtained with immediate followup to process the required written approval.
b. Written approval for overtime work is required for the following reasons:
(1) That strict control may be maintained;
(2) To authorize the Comptroller Department to effect payment to the employees concerned;
(3) To provide certain cost and statistical data.
c. The following officials are hereby authorized to approve for the Production Officer (by direction), overtime work of Production Department employees:
(1) Shipbuilding Superintendent (Code 310)
(2) Ship Repair Superintendent (Code 330)
(3) Shop Superintendent (Code 350)
(4) In the absence of any of the foregoing, their designated representative or the Production Department Duty Officer.
*1262 (5) Procedures. In order to implement reference (a), the following procedure is established for use within the Production Department.
a. Masters and Senior Civilian Supervisors are re-Si to submit Overtime Request Form (3ND-NYNS--25a) to obtain authorization for work in excess of 40 hours for employees under their jurisdiction. This shall include shop employees temporarily on loan to other shops or departments. It should be clearly understood by borrowing activities that overtime work for Production Department employees on loan must be authorized in accordance with the procedure outlined herein.
10. Evidence concerning the nature and circumstances of the meal periods had by the plaintiffs was provided in the form of a pertinent regulation and the testimony of four ship mechanics and a supervisor. The regulation provided:
A 20-minute lunch period will be granted on Government time and employees will be expected to eat at their places of duty.
Testimony concerning the meal periods was vague in many respects and contradictory in some, but certain salient facts worthy of reliance emerge. All meals were eaten on board ship during duty hours. Men were not allowed to leave the ship to which they were assigned during tours of duty, except to visit the canteen on the dock. Most men brought their lunches. On the infrequent occasions when they did not there was not much difficulty in securing a pass to obtain food at the canteen (if a relief was available), but they were required to rush there and back and were not permitted to eat at the canteen. The canteen, which dispensed sandwiches and other light fare, was open at scattered hours during the morning and evening, but apparently not at night. If a man could not be relieved to go to the canteen he could sometimes get another employee to fetch food for him from the canteen.
Guard assignments on a typical ship consisted of a fixed post in a booth, duty at the gangway, or walking rounds with a “detect” clock. The booth was protected from the elements. In addition to a coffee pot and a hot plate, it was equipped with a telephone, a fire alarm, a shift whistle, and *1263 a logbook to be maintained. The man assigned to the guard booth would eat his meal without leaving the booth. Men assigned to the gangway or to a walking post would usually be relieved and would have their meals in the guard booth, where they would not be discharging duties so long as the regular guard remained at his post in the booth, although the latter would sometime be absent relieving men elsewhere for meal periods. Duty interruptions to meal periods taken in the booth were rare, for the surveillance nature of the occupation did not produce frequent emergencies such as fires and other security problems. On probably infrequent occasions the men would eat their meals while walking post with a detect clock. Prior to the period in suit there had been several guards assigned to a single ship, thus providing more opportunity for meal period relief. The number dwindled to two and sometimes less during the suit period, but at times men of other trades provided temporary relief. There were no set times for meals. The meal periods were usually about 20 minutes.
Ultímate Findings
11. It is found that the plaintiffs were, at all times during the period of the claim, required to report to work 30 minutes prior to the start of their tour of duty, but that the orders for this were not issued by authorized officials under Shipyard regulations. The plaintiffs performed services for the defendant during that 30 minutes for which they have not been compensated.
12. It is also found that the plaintiffs performed com-pensable services during their lunch breaks and the time spent in the muster area at the conclusion of their tours of duty.
Conclusion oe Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petition is dismissed.

 Obviously, in order to perform tbe routine mustering-ln procedures referred to above (time cards, clothing change, etc.)' and yet be ready to board a truck en route to their posts 30 minutes ahead of time, the men actually had to report to the muster building some minutes earlier than 30 minutes. However, no claim is made for this small margin.