Per Curiam:
This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 29, 19.67. Plaintiffs filed exceptions to the commis *970 sioner’s recommended conclusion of law and tbe case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are, therefore, not entitled to recover and their petition is dismissed.
OPINION OF COMMISSIONER*
Gamer, Commissioner
: By their joint petition, ten civilian employees of the Department of the Navy who, at various times during the period of their claims (January 1, 1958 to April 9, 1963), served as sergeants on the police force at the Mare Island Naval Shipyard, Vallejo, California, seek to recover overtime compensation under the provisions of the Federal Employees Pay Act of 1915, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. §911 (1964). For the reasons set forth in the following detailed and ultimate findings of fact and conclusions of law, it is concluded that plaintiffs are not entitled to recover.
Collins, Judge, took no part in the decision of this case.
Findings op Fact
1. Plaintiffs are ten civilian employees of the police force employed in the Security Division, Mare Island Naval Shipyard, Vallejo, California. At all times pertinent hereto they have been employed in supervisory capacities, eight as sergeants and two as detectives. By their petition filed February 4, 1964, plaintiffs seek to recover overtime compensation for services performed during the period January 1, 1958 to April 9,1963.
Pursuant to Eule 47(c), the parties, with the approval of the commissioner, agreed that there should be a separate determination of the right of plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
*971 2. Plaintiffs seek recovery pursuant to the provisions of section 201 of the Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1964), which provides, in pertinent part, as follows:
All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed 'by officers and employees to whom this sub-chapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at the following rates: * * *.
As the basis for their claims plaintiffs allege that when serving as police sergeants they were required to report to work 20 minutes prior to the beginning of each 8-hour tour of duty. Defendant denies plaintiffs are entitled to overtime compensation for such early reporting, contending that plaintiffs have not shown that such early reporting during the period in question was “officially ordered or approved” within the meaning of the statute. Further, it seeks to offset against any such periods of extra duty found to be “officially ordered or approved”, the time allowed plaintiffs for meals, as well as the overtime payments received by plaintiffs for reporting early subsequent to the claim period.
3. The civilian police force at the shipyard was under the direct supervision of a civilian chief of police. The police force was composed of the chief, an assistant chief, lieutenants, sergeants, and patrolmen. During the claim period the number of patrolmen employed varied, but averaged about 15 men.
4. At all times material herein, the civilian police or guard force at the shipyard was employed on the basis of an 8-hour working day, operating on the basis of three 8-hour shifts per 24-hour period. The shifts were from 7 a.m. to 3 p.m. (day shift); 3 p.m. to 11 p.m. (evening or “swing” shift); and 11 p.m. to 7 a.m. (midnight or “graveyard” shift). On the day shift the chief and assistant chief were on duty, as well as a lieutenant of the watch and two sergeants. On the evening and midnight shifts the supervisory personnel consisted of two sergeants and a lieutenant of the watch.
*972 5. One sergeant on each shift was assigned as desk sergeant and the other as yard or patrol (sometimes referred to as “outside”) sergeant. The sergeants were sometimes assigned desk sergeant duties and sometimes patrol sergeant duties, although they were at all times classified simply as sergeants.
6. The duties of the desk sergeant were the same for each shift except that the desk sergeant on the night shift had to log in considerably more telephone and radio calls. The desk sergeant supervised the activities of the yard sergeant and the patrolmen. He took orders from higher level supervisors and dispatched the men to perform any necessary duties. He answered incoming radio and telephone calls and generally served as a dispatcher. He had to maintain three different logs (radio, telephone, and key) in the nature of a running report of the day’s activities. Entries were made in the logs as events occurred during the shift, the last entry being for the last telephone and radio call received. He was required to complete and sign the logs for his shift before going off duty. In addition, he had to make out various other reports during his shift.
7c For some time prior to the claim period it was each plaintiff’s practice, when assigned as desk sergeant, to report approximately 20 minutes before his shift started and thus relieve the desk sergeant on duty. This practice enabled the desk sergeant on the preceding shift to pass on to the incoming sergeant any necessary orders and instructions, to complete his logs and reports, and to punch out timely at the end of his shift. The record fails to show the genesis or basis of this early reporting practice with respect to the desk sergeants, i.e., whether it was officially ordered or approved by a duly authorized official, or whether it followed or was pursuant to some order or direction of some official in some position supervisory to the sergeants. However, such early reporting by plaintiffs when serving as desk sergeants was, during the claim period, expected of them by the chief of police. Prior to January 1, 1958, sergeants assigned as desk sergeants were apparently paid overtime compensation for so reporting 20 minutes early, but the record does not *973 show the basis, or the work-hour formula employed, in support or justification of such payments.
8. The patrol sergeant exercised direct supervision over the motorized patrol and the patrolmen on stationary posts. It was the practice, both during the claim period as well as for some time prior thereto, for the patrol sergeant to inspect the patrolmen on his shift for neatness, to inspect their equipment to make certain it was in satisfactory condition and working order, and to pass on to them any necessary instructions and orders. After the men had been dispatched, the patrol sergeant patrolled the shipyard by automobile to make certain that the men were at their stations. At the end of his shift the patrol sergeant was required to go to the armory to issue the necessary weapons to the patrolmen coming on duty for the next shift.
9. About five of the patrolmen were on “early post”, i.e., they had to be at their particular duty stations by a quarter to the hour at which their shift commenced. Thus, in order to properly inspect such patrolmen and their equipment the patrol sergeant would have to report for duty at least 20 minutes prior to the commencement of his shift. The balance of the 20 minutes would be spent in inspecting and instructing the rest of the patrolmen. Such early reporting by plaintiffs when serving as patrol sergeants was expected of them by the chief of police, who considered it the implied duty of a supervisory policeman to properly inspect and post his men. However, as with the sergeants acting as desk sergeants, the record fails to show the genesis or basis of this early reporting practice, i.e., whether it was officially ordered or approved by a duly authorized official or whether it followed or was pursuant to some order or direction of some official supervisory to the sergeants. Here too sergeants assigned as patrol sergeants were, prior to January 1, 1958, apparently paid overtime compensation for so reporting 20 minutes early, but the record similarly does not show the basis therefor, or the work-hour formula employed, in support or justification thereof.
10. (a) In support of their claims herein, plaintiffs rely upon an “Office Memorandum” issued by then Chief of Police *974 McPherson some time in 1957 and which was posted on a bulletin board at the station house (which constituted police headquarters), on which bulletin board the memorandum remained for 30 days, as was customary. This memorandum was addressed to “All Sergeants” and directed that sergeants assigned as patrol sergeants inspect the patrolmen and their equipment before the patrolmen went on duty. As noted, since some patrolmen were required to be at their duty stations 15 minutes prior to the commencement of their shifts, it would be necessary for patrol sergeants inspecting them and their equipment, and giving them any necessary instructions, to report to work at least 20 minutes prior to the commencement of their shifts in order to properly perform the duties specified in the memorandum.[1]
The memorandum referred only to inspections of patrolmen by patrol sergeants. Thus, it did not refer to desk sergeants and their duties.
(b) The record does not show whether Chief McPherson was an official duly authorized by the Navy Department or the responsible officials in charge of the shipyard to fix work hours for the sergeants, to lengthen such hours, or to authorize overtime compensation for work performed in excess of 40 hours a week.
(c) The record further does not show the reason for the issuance of such memorandum since it is clear that it had long been the practice prior to such issuance for the patrol sergeants to perform the duties specified therein anyway and to report 20 minutes early for such purpose. The memorandum apparently merely restated the practice which the chiefs of police at the shipyard had long expected the patrol sergeants to follow.
11. Pursuant to order of one Captain Terry, authorization to make overtime payments to sergeants for reporting to work and performing duties prior to the commencement of their shifts was withdrawn as of January 1, 1958. The record does not show who Captain Terry was, what his position at *975 the shipyard was, or what were his duties and responsibilities (although presumably he was the naval officer having jurisdiction over the civilian police force). Nor is there any showing that, in view of his new order, Captain Terry or other duly authorized official, approved of any continued early reporting system, or was even cognizant thereof.
12. Some sergeants felt aggrieved by the new policy of withdrawing the overtime payment authorization. As a test of such policy some of the sergeants performing duties as both patrol and desk sergeants stopped coming in 20 minutes early. However, after being orally reprimanded by Chief McPherson, who apparently felt that his 1957 office memorandum which had been posted on the bulletin board for 30 days was still in effect and, further, apparently construed it as applying to desk sergeants as well as patrol sergeants (although, as noted, the memorandum itself referred only to the inspection duties which were to be performed by the patrol sergeants), such early reporting practice was resumed. Although Chief McPherson left in 1959, the early reporting practice by the sergeants continued throughout the claim period herein involved, subsequent chiefs of police apparently expecting such practice to continue. Orders issued by one chief are considered as continuing even though the chief has been succeeded. However, none of the sergeants ever filed any formal protest or grievance under any Navy Department procedures with respect to being required to conform to such early reporting practice.
13. Navy Civilian Personnel Instructions (NCPI) 80, Grievances and Complaints, revised September 4, 1958, and subsequently amended, provided for a four-stage appeal of all employee grievances. NCPI 80.1 — 4 provided that “The recognition and correction of causes of grievances are fundamental and major responsibilities of management. Management of activities shall insure that the procedure for initiation and disposition of grievances is brought to the attention of and made available to all employees. * * *” NCPI 80.2-1 provided that “At each stage in the grievance procedure, the employee is expected to state specifically why he is aggrieved and the corrective action which he seeks.” NCPI 80.2-1 (b) *976 provided that in the “first stage” appeal “The employee shall first take the matter up with his immediate supervisor, who shall make any investigation or obtain any advice necessary to make a decision based on full and fair consideration of all the facts.” If the matter was not settled to the employee’s satisfaction at the first stage, he was entitled to a second-stage appeal to the nest level of supervisor. At this level he was entitled to a hearing and to produce witnesses in his behalf. (NCPI 80.2-1 (d).) If the decision failed to satisfy him, the employee was then entitled to a third-stage appeal to the commanding officer of the installation and obtain another hearing. (NCPI 80.2-1 (f).) If he was still unsatisfied he was entitled to a fourth-stage appeal to the Secretary of the Navy. (NCPI 80.2-1 (g).)
Personnel Instructions of this type were in effect during the entire claim period. However, said NCPI 80 also provided that it was necessary to draw “a distinction between individual grievances and those involving more general issues which are normally the subject of consideration by management and groups of employees or their representatives. Matters affecting general working conditions and which may be matters of employee interest are not, per se, grievances. Matters of such general concern which have broad application, such as those regarding general policy, administrative practices, and working conditions, are not appropriate for handling under this grievance procedure; they fall more properly within the classification of matters to be dealt with by management in their group dealings with employees as outlined in NCPI 60.”
Further, NCPI 770, dated June 15, 1962, stated, in paragraph 1-2, “Policy”, that: “The procedure established by this Instruction covers grievances, appeals, complaints, and misunderstandings that are personal to an individual employee, the solution or settlement of which will usually affect only that particular individual.”
14. Each sergeant, whether serving as desk or patrol sergeant, was entitled to a 20-minute lunch period during each 8-hour shift, although he was on duty status during such period and subject to call. There was no fixed time for *977 lunch, but normally the lunch period was taken during the middle of the shift. The 20-minute lunch period was in effect throughout the claim period. Each man was informed of this practice as part of his initial indoctrination. Tire lunch break could be taken in the shipyard cafeteria (which was about a block from the police station), the canteens, or any other approved place on the base, except that during the 40-minute lunch period applicable to the entire shipyard, the sergeants were not entitled to be served at the cafeteria or canteens.
Some of the men ate at the cafeteria when it was open for service to them. During part of the claim period it was open 24 hours a day, but subsequently it was closed during the midnight shift. After the cafeteria closed they could obtain such food as coffee and doughnuts at the canteens. Most of the men, however, brought their own lunch and ate it in the squad room in the police station. Accordingly, in actual practice there was no appreciable difference with regard to lunch breaks between the three shifts. There were tables, chairs, and hot plates in the squad room, as well as magazines and a radio.
15. It was accepted practice for all of the sergeants to take the 20-minute break for lunch and in the great majority of the periods they used the full 20 minutes without interruption, although, as stated, they were “on call” during their lunch period. Occasionally their lunch was interrupted due to the necessity to perform some duty. A stipulation entered into on behalf of all the plaintiffs herein concedes an uninterrupted lunch period in approximately 80 percent of the instances.
In the event the lunch period was interrupted plaintiffs were allowed, since there was no fixed time during the shift for a luncheon period, to return and finish their lunch if they so desired, or to complete it later on during the shift, although in some such instances they would simply forego the balance of their lunch period.
16. Since the desk sergeant’s desk, telephones, and radio would have to be covered at all times, it was his usual practice to ask the watch lieutenant (who worked in the same *978 office) or tbe patrol sergeant to relieve him when he wanted to take his lunch break. The desk sergeant’s lunch was interrupted only in the exceptional case where he was being relieved by the patrol sergeant, the lieutenant was not available to cover the desk, and the patrol sergeant was required to leave to respond to a fire alarm or perform some other duty. In such case, the desk sergeant would have to return to cover the desk.
There was no requirement that the patrol sergeants be relieved for lunch. The normal practice was for the patrol sergeant to take his lunch after the desk sergeant had finished his, but sometimes the patrol sergeant ate first.
17. Plaintiffs never filed any formal complaints to the effect that their lunch periods were being either interrupted or denied altogether.
Ultimate FINDINGS and CONCLUSIONS
18. Plaintiffs rely on the office memorandum issued by Chief McPherson in 1957 and which was posted on the bulletin board in the station house for 30 days as constituting a written order imposing duties on them which, in order to perform in appropriate manner, necessitated their reporting to work 20 minutes before their regular 8-hour shifts. However, plaintiffs have failed to show (and indeed made no attempt to prove) that 'Chief McPherson was an official who was authorized, by the Department of the Navy or the appropriate official's in charge of the Mare Island Naval Shipyard, to issue orders concerning work hours, and to commit defendant to the payment of overtime compensation by lengthening the work hours. Appropriate action by an official having authority to order or approve overtime is a condition to recovery in this type of case, for obviously not every departmental official is empowered to so change the work hours of employees as to compel the payment of overtime, or otherwise to approve overtime. Bilello, et al. v. United States, 174 Ct. Cl. 1253 (1966); Bantom,, et al. v. United States, 165 Ct. Cl. 312 (1964), cert. denied, 379 U.S. 890; Tabbutt, et al. v. United States, 121 Ct. Cl. 495 (1952). As was stated in Albright, et al. v. United States, 161 Ct. Cl. 356, *979 381 (1963) (civilian, security guards employed at the Nor folk Naval Shipyard), in disallowing a portion of the claimed overtime period, “The plaintiffs not only have the burden of proving that they were ordered to appear 20 minutes before the shift started, but also that the order was issued by one having the authority to do so.”[2] Despite Chief McPherson’s 1957 order, overtime payments that had been made prior to January 1, 1958 for early 20-minute reporting ceased upon the orders of one Captain Terry, who presumably was, therefore, the official at the shipyard who was vested with the required authority concerning the establishment of work hours and the approval of overtime payments (although the record also fails to show exactly with what powers this official was vested or what authority he had).
Thus, the mere fact that plaintiffs might have worked overtime during the period herein involved is not determinative of their right to receive compensation therefor. “ * * * the court has not given judgment under this type of overtime legislation (relating to federal employees) unless the work or activity which is the basis of the claim has been authorized, approved, ordered or confirmed by an authority empowered to do so.” Gaines v. United States, 158 Ct. Cl. 497, 501 (1962), cert. denied, 371 U.S. 936 (1964).
19. Said 1957 memorandum upon which plaintiffs rely, although addressed to “All Sergeants”, actually referred only to the inspection duties and responsibilities of the patrol sergeants. Thus, the directions contained in the memorandum had no applicability to the desk sergeants and such memorandum could not therefore in any event properly be the basis for an overtime claim by such sergeants.
20. Although the proof does make plain that the plaintiffs, when serving both as desk and patrol sergeants, did customarily report to work 20 minutes early during the claim period of January 1,1958 to April 9,1963, and that they were expected to do so by their superiors in the police department (the lieutenants and the chief), being reprimanded by such *980 superiors when they failed to so report, plaintiffs hare failed to carry their burden of proving that such early reporting was, within the meaning of the statute, “officially ordered or approved” by a duly authorized Navy Department official, nor have plaintiffs shown that anyone with such requisite authority was even cognizant of the existence of such practice during the claim period.
21. Based on the record herein, during the claim period plaintiffs were entitled to, and in the great majority of instances received, a full 20-minute lunch period during each shift. On the occasions when such lunch periods were, due to the fact that they were on duty status during such period, interrupted by the performance of emergency duties, plaintiffs were entitled, and in fact were able, to finish their lunch period after the emergency was over. They were paid at regular rates for such lunch periods. Accordingly, such 20-minute lunch periods would in any event equal the early reporting time, thus resulting in plaintiffs working only 8 hours. The situation here is more like that in Bantom, et al. v. United States, supra, wherein it was shown that the security policemen therein involved were entitled to a lunch period of specified duration, and that such a “lunch period away from their posts was generally available” (at 319) than that in Albright, et al. v. United States, supra, where, in allowing recovery for part of the claimed overtime work, the court found that “most of the [security] guards * * * ate on the job at their assigned posts” (at 361) “* * * that is, while walking a beat, sitting at a stationary post, or while riding in a vehicle on a patrol assignment” (at 368).
It is settled that the mere fact that an employee is required to eat lunch on the employer’s premises and to be in a duty status and subject to call during such period, does not automatically make such period “overtime”. The actual performance of substantial duties during such period is a prerequisite to recovery. Bantom, et al. v. United States, supra (at 320). The record does not support the performance of such duties by plaintiffs during the claim period herein involved.
22. Defendant contends that recovery is in any event barred due to plaintiffs’ failure to exhaust their administrative *981 remedies by invoking the Navy grievance procedures to protest the early reporting practice. It further contends that, to the extent plaintiffs seek to overcome the offsetting effect of their generally duty-free lunch periods by showing that such periods were sometimes interrupted, they are likewise barred by their failure to complain of such interruptions. However, defendant has failed to show that these matters would properly be considered by the Navy Department as falling within, and therefore being covered by, the “grievance” procedures set forth in the Navy Civilian Personnel Instructions upon which defendant relies. As the Instructions themselves indicate, the grievance machinery would appear to relate to “individual grievances” and not to “general issues” relating to “groups of employees”, such as “general working conditions” having “broad application” (finding 13). They were intended to apply only to situations “personal to an individual employee” and affecting “only that particular individual”. The matters about which plaintiffs here sue would appear to fall within the “broad application”, and not the “individual employee”, category. Accordingly, this basis of defense does not, on this record, have merit.
23. Plaintiffs contend that they have received overtime payments for such early reporting both before and after the claim period herein involved and that they should therefore have received such payments during the intermediate claim period too. Defendant contends that, because of the offsetting lunch period, only 8 hours were in fact worked and that the overtime payments since April 9, 1963 have been paid in error. It seeks to offset such alleged erroneous payments against any recovery to which plaintiffs may be entitled herein.
However, because the record herein fails to show the basis or justification, or the work-hour formulas employed, for such overtime payments in such nonclaim periods, which periods, because of possibly different conditions, would not necessarily be relevant to the claim period, neither plaintiffs’ nor defendant’s contentions or offset claims in these respects have merit.
*982 24. That portion of the period of plaintiffs’ claims wbich is prior to February 4,1958, i.e., January 1,1958 to February 3,1958, is in any event barred by the 6-year statute of limitations (28 U.S.C. § 2501 (1964)), the petition herein having been filed on February 4, 1964.
Conclusion op Law
Upon tbe foregoing findings of fact and conclusions of law, wbicb are adopted by tbe court and made a part of tbe judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.

The opinion, findings of fact, and recommended conclusion of law are submitted under tbe order of reference and Rule 57(a).

 Despite diligent efforts to locate it in connection with these proceedings, neither the original nor any copy of such memorandum could be found. However, the testimony of several of the plaintiffs makes clear that such a memorandum was issued by Chief McPherson some time in 1957.

 In the Albright case, it was shown thajfc the security officer at the shipyard had the requisite authority. However, the proof was less clear as to the chief of police, the court noting that “perhaps” he too had such authority (at 361).