**Boykin W. BATES et al.**

v.

**The UNITED STATES.**

No. 152–68.

United States Court of Claims.

Nov. 12, 1971.

Skelton, J., dissented and filed opinion in which Collins, J., concurred.

Edward L. Merrigan, Washington, D. C., Attorney of Record, for plaintiff. Smathers & Merrigan, Washington, D. C., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on January 26, 1971. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by defendant and the case has been submitted to the court on the briefs of the parties and oral argument of counsel.

The court agrees with the commissioner's opinion, findings of fact, and recommended conclusion of law, as hereinafter

set forth,* except in the following particulars. A difficult issue was whether the persons found to have ordered or approved plaintiffs' overtime had authority to do this. The commissioner's opinion and finding 19 recite how the defendant stipulated that certain persons had such authority. Subsequent to the trial defendant learned, as it came to believe, that the stipulation was in fact in error and sought to withdraw the same, being willing plaintiffs should reopen the proof if they so desired. Some of us would handle the matter exactly as the commissioner has. Others would prefer not to rely wholly on a repudiated stipulation under the facts of this particular case. They agree with plaintiffs' alternative argument. They would construe the regulations set forth in findings 21 and 22 as not reserving to the departmental level authority to order or approve overtime not recognized at the time as being overtime, such reservation being applicable only to a regular and intentional extension of the workweek. Since either view would justify the result, it is unnecessary to choose between them and we do not do so.

The case was tried, submitted to the trial commissioner, and decided by him without differentiating between, on the one hand, the plaintiffs' changing into and out of uniform, and, on the other hand, the pre-shift activities described in findings 14 and 15. All these activities were lumped and treated together, and the considerations specially incident to the compensability of uniform changing were not treated. Accordingly, the court does not consider in this particular case, whether time required for changing into or out of uniforms, when considered separately, is or is not compensable, and our holding here is not a precedent, one way or the other, on that separate problem.

In view of the foregoing, the court concludes as a matter of law that plaintiffs are entitled to recover, and judgment is entered to that effect, with the amounts of recovery to be determined in further proceedings pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

By their joint petition filed May 13, 1968, plaintiffs seek to recover overtime compensation pursuant to the provisions of the Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1964).

It is my opinion that plaintiffs are entitled to recover, that judgment should be entered to that effect, with the amounts of recovery to be determined in further proceedings.

During all or part of the claim period (May 13, 1962 to April 6, 1966) each of the plaintiffs was a classified civil service employee (Grade GS-3 or 4) at the Lenwood Division of the Veterans Administration Hospital, Augusta, Georgia, serving either as a Nursing Assistant or as a Physical Therapy Assistant.

Throughout the claim period, existing regulations of that hospital, signed and issued by Dr. E. P. Brannon, the Hospital Director, or by Mr. Donald Cowley, the Assistant Hospital Director, by direction of the Hospital Director, required plaintiffs to wear Government-issued uniforms in the performance of their official duties. Liberally starched in the laundering process at the hospital, such uniforms consisted of white jackets, or shirts, and white trousers. The regulations provided that plaintiffs could wear such uniforms only while on duty, and the wearing of them to and from work was specifically prohibited.

As of April 6, 1966, the hospital regulations were amended by memorandum signed and issued by Dr. Brannon as the Hospital Director, to permit plaintiffs and other employees to wear such uniforms to and from work, and such date marks the end of the claim period.

---

* The dissenting opinion of SKELTON, Judge, in which COLLINS, Judge, concurs, follows the opinion of the Trial Commissioner which has been adopted by the court. [Findings of fact omitted from published opinion.]

To implement the uniform regulations, each plaintiff was provided with a locker in the basement of one of the hospital buildings, and on each of his working days was required to go to his locker, remove his civilian clothing, and change into the Government-issued uniform prior to the start of his scheduled shift. After the end of each shift, each plaintiff had to return to his locker and remove the uniform and change into his civilian clothes. Clean uniforms were regularly provided by the hospital.

Plaintiffs Earnest R. Holley (4) and Bobby C. Jones (7) were Physical Therapy Assistants. The other 10 plaintiffs were Nursing Assistants.

The Nursing Assistants worked variously on three shifts, with each subject to periodic rotation from one shift to another. The three shifts were 7:00 a. m. to 3:30 p. m., 3:30 p. m. to 12 midnight, and 12 midnight to 8:00 a. m. With respect to the two 8½-hour shifts, an off-duty lunch period of ½ hour was provided. With respect to the midnight shift, Nursing Assistants were permitted to consume food while on duty observing the patients in the wards of the hospital. Eating time is not involved in the subject claims for overtime compensation.

During the overlap of 1 hour between the midnight and day shifts, the Nursing Assistants of the prior shift engaged in serving breakfast to patients, while those of the succeeding shift were in part assigned duties relating to daytime operations.

The Physical Therapy Assistants worked only one shift, 8:00 a. m. to 4:30 p. m., with ½ hour off-duty for lunch.

At all relevant times the Lenwood Division of the subject VA facilities was a neuropsychiatric hospital. The patients were mentally disturbed, and some were also stricken with tuberculosis or other serious ailments requiring surgical or special medical treatment. They presented unusual behavior problems by the nature of their illness, such as extreme depression to the point of self-harm,

acute panic, actively homicidal tendencies and extreme restlessness.

When injuries occurred to a patient, an investigation was conducted by the hospital authorities to determine responsibility.

The Nursing Assistants received their daily assignments from and were subject to the supervision of the head nurse of their ward and of the other professional nurses assigned to the ward. Their principal duties were to observe, guide and assist the patients assigned to their care and to accomplish some treatment of the patients under the supervision of the physicians and registered nurses. They served as team members with the doctors and nurses to plan the treatment of and to treat the patients assigned to their care.

The Physical Therapy Assistants worked in various therapy rooms and clinics throughout the hospital, not on the wards. Under the direction of a physical therapy supervisor, they provided to patients physical therapy treatments of various types.

As to the Nursing Assistants, the pertinent chain of responsibility, or inverse order of authority, was from them through levels of registered nurse positions, i. e., ward nurse, head ward nurse, unit supervisor, Assistant Chief and Chief, Nursing Service, to the Chief of Staff, who was a doctor, to the Assistant Hospital Director and Hospital Director.

Illustrative of the practices at the subject hospital, both before and during the claim period, concerning the pre-shift functions of oncoming Nursing Assistants was the testimony of Mrs. Laura W. Fitzsimmons, who was Chief, Nursing Service, of subject hospital from October 1947 to the spring of 1960. Toward the end of her period of service, there had been accidents or injuries to patients, concerning which there were conflicts between oncoming and outgoing shifts of Nursing Assistants as to when such injuries had occurred, thus complicating the hospital's program of investigating the

cause of any injury sustained by a patient.

In early 1960, Mrs. Fitzsimmons was instructed by the former Hospital Director of subject hospital, who was deceased at the time of the trial of this case, to issue a memorandum to the effect that all Nursing Assistants were to report in uniform 15 minutes before the scheduled start of their shifts, and that the oncoming Nursing Assistants and those ending their duty hours would make rounds jointly to inspect the patients on the wards. Mrs. Fitzsimmons prepared such a memorandum, issued it to the various head nurses of the wards, and caused the same to be posted on the bulletin boards in the various wards of the hospital.

There is no showing that Dr. Brannon, who thereafter became the Hospital Director, was ever aware of the existence or issuance of the Fitzsimmons memorandum.

However, on February 28, 1962, Dr. Brannon, as the Hospital Director, issued written instructions to all employees, commented that there had been apparent laxity of employees in their adherence to the established duty hours, and in that respect stated:

> * * * Strict conformity to the scheduled hours of duty and the authorized period granted for eating purposes must be a mandatory requirement. All employees should be at their respective areas sufficiently in advance of the scheduled duty hours to commence work at the scheduled time.
> * * *

Certainly the reasonable inference is that Dr. Brannon used the above-quoted terminology in contemplation of the standing practice, of which he must have been aware, that oncoming Nursing Assistants were required to be on their wards in uniform to perform certain duties prior to the scheduled start of their shift jointly with the outgoing Nursing Assistants.

The Nursing Assistants reasonably understood, from the instructions issued by Dr. Brannon, as implemented by directions issued by supervisory personnel, and in accordance with long-standing practice, of which Dr. Brannon must have been aware, that they were required to report, and in fact they did report throughout the claim period, in uniform to their assigned wards in advance of the scheduled start of their assigned shift. During such pre-shift period, each of the oncoming Nursing Assistants signed the personnel roster of his ward, reported to the assigned head nurse who briefed him on any problem or unusual circumstance existing on the ward, received his assignments for the shift, and proceeded with other oncoming Nursing Assistants to conduct with the outgoing Nursing Assistants a tour of observation of the patients and inspection of the security of locks and window grills on the ward.

The responsibility for patient count, as distinguished from the other pre-shift duties, was regularly assigned by the head nurse to one of the oncoming and one of the outgoing Nursing Assistants, who during the pre-shift activities by visual observation and by check-list accounted for all patients assigned to the ward.

The Physical Therapy Assistants also reasonably understood that they were required to report, and throughout the claim period, they did report in uniform to their physical therapy supervisors in advance of the scheduled start of their shifts. During such pre-shift period, each Physical Therapy Assistant received his instructions and assignments for the shift from his physical therapy supervisor. The reasonable inference is that the Hospital Director was aware of such practices at all relevant times.

█ From all of the evidence in this case, it is found that throughout the claim period, each plaintiff who was a Nursing Assistant was required to spend 25 minutes per shift, and each plaintiff who was a Physical Therapy Assistant was required to spend 15 minutes per shift, in the pre-shift and post-shift

changing into and out of his uniform and in the performance of the pre-shift duties described above. Such time was in excess of the 8 hours of duty performed by each plaintiff on his shift. Each plaintiff worked five shifts per week.

Plaintiffs have never been paid by defendant for the time spent in changing into and out of the uniforms and in the performance of the pre-shift duties.

Whenever a Nursing Assistant failed to report on his assigned ward in uniform in time to engage in pre-shift activities, his head nurse admonished him and requested an explanation as to why he was late.

During the claim period, and prior thereto, plaintiffs generally voiced objections to their head nurse or supervisor concerning the requirements for reporting in uniform to perform duties in advance of the scheduled start of their shifts, and the response was generally in substance that such requirements were those of the Hospital Director whose authority was not to be questioned.

During the pretrial procedures in this case, plaintiffs by letter to the previously assigned trial commissioner of this court suggested that among other matters, the following be made the subject of pretrial stipulation:

2. The names and positions of supervisory personnel who were duly authorized by regulation or otherwise during the period from June, 1962 through December, 1965 officially to order or approve overtime for Nursing Assistants at the hospital.

In response to such letter, defendant by letter advised plaintiffs among other matters, that individuals authorized to approve overtime during the claim period were Mr. Donald Cowley and Dr. E. P. Brannon.

During the claim period, Dr. Brannon and Mr. Cowley were respectively the Hospital Director and the Assistant Hospital Director of the subject hospital.

Both plaintiffs' letter and defendant's letter were received in evidence without objection at the pretrial conference, as shown by the previously assigned commissioner's Memorandum Re Pretrial Conference, filed August 6, 1969.

During the course of the trial of this case, held December 10 and 11, 1969, at Augusta, Georgia, defendant's assigned attorney conceded, when plaintiffs' attorney was undertaking to prove authority of local personnel of the subject hospital, that it was stipulated that Dr. Brannon and Mr. Cowley had the authority to order and approve overtime during the claim period at the subject hospital. Such concession was made near the outset of the trial and also during the second day of trial procedures. Neither Dr. Brannon nor Mr. Cowley was called as a witness in this case.

The pertinent statutory provisions governing plaintiffs' claims are as follows:

§ 911. Payment of overtime; rates.

All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed by officers and employees to whom this subchapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at the following rates:

(1) For each officer and employee whose basic compensation is at a rate which does not exceed the minimum scheduled rate of basic compensation provided for grade GS–9 in the Classification Act of 1949, as amended, the overtime hourly rate of compensation shall be an amount equal to one and one-half times the hourly rate of basic compensation of such officer or employee, and all of such amount shall be considered premium compensation. [5 U.S.C. § 911 (1964)]

The determinative issue in this case is whether or not the overtime work performed by plaintiffs in this case was "work officially ordered or approved." If defendant is to be held bound by its stipulation that Dr. Brannon and Mr.

Cowley had the authority to order and approve overtime during the claim period at subject hospital, then any discussion concerning the interpretation to be given to Veterans Administration regulations and regulations of the subject hospital would clearly be *obiter dicta.*

It is well settled that absent special considerations, a stipulation by a party in interest is binding upon such party. It is my conclusion that there are no special considerations in this case which justify a departure from such rule. F & D Property Co. v. Alkire, 385 F.2d 97, 100 (10th Cir. 1967); Missouri-Illinois R. R. v. United States, 381 F.2d 1001, 1003, 180 Ct.Cl. 1179, 1184–1185 (1967); John McShain, Inc. v. United States, 375 F.2d 829, 831, 179 Ct.Cl. 632, 635 (1967); Diapulse Corp. of America v. Birtcher Corp., 362 F.2d 736, 744 n. 7 (2d Cir. 1966), petition for cert. dismissed 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48; H. B. Zachry Co. v. United States, 344 F.2d 352, 357, 170 Ct.Cl. 115, 123 (1965); Bruno New York Industries Corp. v. United States, 342 F.2d 75, 76, 78–79, 169 Ct.Cl. 999, 1001, 1005, 1007 (1965). On the basis of the stipulation, entered into as described above, and the regulations and instructions issued by or under the direction of Dr. Brannon, it is concluded that the subject overtime work was officially ordered and approved.

Defendant's further contention is rejected that the overtime work performed by plaintiffs was not compensable as being *"de minimis"* in amount. Albright v. United States, 161 Ct.Cl. 356, 358 (1963). *Cf.* Bantom v. United States, 165 Ct.Cl. 312, 315, cert. denied 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964).

SKELTON, Judge (dissenting):

I respectfully dissent.

Our trial commissioner based his judgment on the validity and binding effect of the stipulation of counsel in this case to the effect that the local V.A. Hospital Director and Assistant Hospital Director were authorized to approve overtime during the claim period. On that basis, the trial commissioner was correct in entering judgment for the plaintiffs. However, in my opinion, he was in error in holding the government to the stipulation under the facts and the law in this case, and, consequently, his decision was erroneous. In like manner, the decision of the court in upholding his decision for the plaintiffs is an error.

The major question in the case was whether the local director or assistant director, or both, were authorized to approve regular overtime for employees at the hospital. The law is clear that they could not do so. The statute which is applicable is 5 U.S.C. § 911, which requires overtime work to be officially ordered or approved. It authorized the Civil Service Commission to issue regulations implementing the statute, which has been done. The regulations are 5 C.F.R. § 25.-221 (1949 ed.) and 5 C.F.R. § 550.111 (1964 ed.), which provide that overtime work to be "officially" ordered or approved must be ordered or approved *in writing* by an official who himself was authorized to order or approve such overtime.

Veterans' Administration regulations (Regulation MP–5, paragraph 7), provided in pertinent part as follows:

7. Overtime

* * * *Supervisory personnel* must obtain proper authorization for overtime before permitting or requiring the performance of overtime work by an employee. *Heads of departments and other top staff officials* are authorized to prescribe, in their responsible areas, such limitations as are necessary to provide control and prevent abuse of the use of paid overtime. * * * (Emphasis supplied.]

Definitions of *regular* and *irregular* overtime were set forth in the regulations as follows:

(a) *Regular overtime work* means overtime work which is regularly scheduled. For this purpose, any overtime work scheduled for an employee

in advance of the administrative workweek in which it first is to occur, and which will recur over an extended period of time (at least 2 consecutive administrative workweeks) constitutes regular overtime.

(b) *Irregular occasional overtime work* means overtime work which is not regularly scheduled.

Paragraph 5(b) of the June 14, 1965, revision of MP–5 provided:

b. *Basic Workweek Plus Regular Overtime.* A regularly scheduled administrative workweek consisting of the 40-hour basic workweek, plus a period of regular overtime work, may be established for an employee or groups of employees by *department heads or staff office heads, or their designees,* for their respective personnel within Central Office, and by *Directors or Managers* of field stations *when authorized by their respective department heads.* * * * [Emphasis supplied.]

*Irregular* overtime was covered by paragraph 7(b) as follows:

(1) *Authorization.* Staff office heads, heads of departments, Directors and Managers of field stations, Assistant Directors, Supply Service at supply depots, or their designees, are authorized to order and approve *irregular* or occasional overtime. [Emphasis supplied.]

The V.A. regulations in force during the claim period further provided:

* * * The establishment of a regularly scheduled administrative workweek which includes regularly scheduled overtime shall require approval by the department heads for field stations, and by department heads or top staff officials for Central Office. The document establishing such regularly scheduled administrative workweeks shall identify, by calendar days and number of hours per day, the periods of time which do not constitute a part of the basic workweek.

The foregoing regulations show beyond question that regular overtime had to be ordered or approved by the head of the department or staff office heads or their designees in Washington in writing and could not be authorized or ordered by local directors or assistant directors of hospitals. There is no proof in this record that the head of the department or any staff office head, or their designees, ever ordered or approved the alleged overtime claimed by the plaintiffs in this case. Under such circumstances, the plaintiffs have failed to prove an essential element of their case.

The trial commissioner and the court gets around this defect by holding valid and binding the stipulation of counsel that the local director and assistant director of the hospital was authorized to order and approve overtime. This stipulation was clearly erroneous because it was contrary to the above regulations, which were in evidence. Government counsel entered into the stipulation through erroneous information furnished him from Washington. However, he discovered the error after the evidence was closed but before the trial commissioner rendered his decision and called it to the attention of plaintiffs' counsel and the commissioner and asked to be relieved from the stipulation. He also offered to allow proof to be reopened in the case. Both counsel for the plaintiffs and the commissioner refused. The commissioner proceeded to enter judgment for the plaintiffs based on the stipulation.

I think this was error. The defendant called the mistake to the attention of the commissioner and the plaintiffs in plenty of time for the plaintiffs to have offered other or additional proof in support of their case. They chose not to do so. In fact, they have not shown they would have or could have offered any more or different proof had the stipulation not been made. Consequently, they have not shown any prejudice or injury by reason of the stipulation nor any that would result to them if the government were relieved from it.

The situation boils down to the simple proposition that the lawyers for the

parties entered into a stipulation through error and mistake that was contrary to the law and the facts in evidence before the trial commissioner. The error was called to the attention of plaintiffs' counsel and the commissioner at the trial level. The commissioner is an arm of this court. He acts as a trial judge. He had full authority to correct this situation by relieving the defendant of the stipulation and allowing the parties to offer additional evidence at the trial level. In the interest of justice, this should have been done.

The Supreme Court, as well as this court and other courts in the interest of justice have relieved parties from stipulations erroneously entered into that were contrary to the law or the facts, or both. In the case of Swift & Company v. Hocking Valley Ry., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917), a stipulation that was contrary to the facts in the case was before the court. The court rejected the stipulation, saying:

> If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. * * If the stipulation is to be treated as an attempt to agree "for the purpose only of reviewing the judgment" below that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented. "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. * * * No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard." [Footnote omitted.] [*Id.* at 289, 37 S.Ct. at 289, 290.]

This court held in H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115 (1965), that it would relieve a party of a stipulation where necessary to prevent an injustice, particularly where facts contrary to the stipulation are established by the evidence. In the recent case of Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 194 Ct.Cl. 574 (1971), this court held that the government should be relieved from a stipulation entered into between a government attorney and a contractor during a proceeding before a Board of Contract Appeals, saying:

> * * * We think this case presents special considerations. *Where the subcontracts themselves are part of the record, any stipulation as to their legal effect is not operative.* Were we to rule otherwise, this court would be in the position of allowing counsel to stipulate the law, a function which, in the context of a judicial proceeding, is the province of judges. Not only has this court refused to be bound by a stipulation on an issue of law, The Sac & Fox Tribes, et al. v. United States, 315 F.2d 896, 161 Ct.Cl. 189 (1963), but the United States Supreme Court has made similar pronouncements, Swift & Co. v. Hocking Valley Ry., 243 U.S. 281 [37 S.Ct. 287, 61 L.Ed. 722] (1917). * * * [Emphasis supplied.] [440 F.2d p. 1012.]

The interpretation and construction of a regulation is a question of law to be decided by the court. Nager Electric Co. v. United States, 442 F.2d 936, 194 Ct. Cl. 835 (1971).

In the case of Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 444, 22 S.Ct. 698, 714, 46 L.Ed. 968 (1902), the Supreme Court held that a stipulation:

> * * * [O]ught not to be used as a pitfall, and where the facts subsequently developed show, with respect to a particular matter, that it was inadvertently signed, we think that, upon giving notice in sufficient time to prevent prejudice to the opposite party, counsel may repudiate any fact inadvertently incorporated therein. This practice has been frequently upheld in this and other courts. [Cases omitted.]

These cases announce principles that are not only correct in law but also are fair and just. When the stipulation in the case before us is tested by these authorities, it is crystal clear that it must be ignored and the government relieved from it. Otherwise the law and the facts become immaterial.

After all, the trial of a lawsuit is not like playing a game where the outcome is determined by the efforts of the participant who is the most skillful and adroit in "moving his men about the chess board." The court should be interested in determining the true facts and the law and then applying the law to the facts, regardless of the ingenuity of counsel in obtaining stipulations. This is especially true where the stipulation is contrary to the law and the facts, as here.

The stipulation in this case should be set aside or ignored and the defendant relieved from it. When this is done, we are left with the true facts and the law as expressed in the regulations. Under these circumstances, the judgment should be rendered for the government, because the regulations clearly and plainly provide that only the head of the department or his designees can order or approve overtime, and this was not done here.

The court's opinion speaks of some judges believing that even if the stipulation is not binding, the regulations can be read to say that the local director of the hospital can order or approve regular overtime. In my opinion, this is a strained construction of the regulations that is contrary to the plain and unmistakable language contained therein. All that is needed to refute this view is to read the regulations themselves. Furthermore, this construction of the regulations will lead to a serious problem later on for any judge holding this view, because in a companion case already tried in this court (Anderson v. United States, Court of Claims No. 151–68), where the facts are the same as here (except for the stipulation), a high level official of the V.A. testified without contradiction that no local hospital official was authorized to approve or order regularly scheduled overtime and that the lowest level agency official who could do so was the Chief Medical Director of the agency (in Washington).

The opinion acknowledges that there is a division among the judges as to the stipulation issue as well as on the interpretation of the regulations. Yet it does not show how the judges are divided as to the number favoring or rejecting each issue. Consequently, it is impossible for any one reading the opinion to determine whether a majority approves the decision of the trial commissioner based on the validity and binding effect of the stipulation. For the same reason it cannot be determined whether a majority reject the stipulation and interpret the regulations favorable to the plaintiffs. It is clear that we do not have a majority decision of the court on these issues. Furthermore, the opinion states that it does not decide whether time required for changing into or out of uniforms, considered separately, is or is not compensable. It is obvious that the court has avoided and side-stepped all the issues in the case and has decided none of them. All that it has decided is that by some sort of a jury verdict the plaintiffs are entitled to a judgment without showing why this is so.

This is an important case. In fact, it is a test case that was instigated by an employees' union. The government says it may affect 750,000 government workers. I think the government, the workers, the union, as well as the bench and bar are entitled to have a decision of this court on the issues in this case. This is also true with respect to our trial commissioners who now have one or more cases before them involving the same issues. All that anyone can deduce from the opinion of the court is that the plaintiffs win and the government loses.

I think the opinion should be written to show the majority vote of the judges of the court on each issue. If there is a division in the opinions of the judges,

that should be shown also—how each judge stands. That is the customary procedure in this court and it is the only way the court and the bench and bar can work effectively.

The plaintiffs make an alternative contention that the claimed overtime here was actually "irregular" overtime and the local director was authorized to order and approve it. This is not sound, because the regulations quoted above provide that:

Irregular occasional overtime work means overtime work which is not regularly scheduled.

This clearly means work of an emergency nature that occurs only occasionally. This does not jibe with plaintiffs' claim here. They claim they worked overtime regularly *every day for six years*. This could not be "irregular" or "occasional" overtime.

The defendant contends that even if the local director of the hospital had the authority to order or approve regular overtime, which it does not admit but denies, he did not ever do so. There was some evidence, objected to by defendant, that *prior* to the claim period a chief nurse named Fitzsimmons posted a notice to nurses under the authority of the then Hospital Director, a Dr. Tighe who was deceased at the time of the trial, directing them to report in uniform 15 minutes prior to their work shift. However, there was no evidence that this Fitzsimmons' memorandum, if it ever existed, was still in effect during any part of the claim period. In fact, the chief nurse and his associate chief testified that no such rule had been in effect during the claim period. Dr. Brannon, the Hospital Director during the claimed period, never heard of such a memorandum and the trial commissioner so found. Under all of these circumstances, the Fitzsimmons' memorandum should not be considered for any purpose.

This leaves us to consider what Dr. Brannon did by way of issuing orders relating to work during the claimed period. The only orders he issued in this regard were those prohibiting the wearing of uniforms to and from home and requiring them to be kept in lockers at the hospital, and an order urging all employees to be at their respective duty posts in sufficient time "to commence work at the *scheduled* time." The defendant says this was merely a "don't be tardy" memorandum. It is true that the order did not require the workers to report for work any *specified time* or *number of minutes* before their scheduled time began. It seems to me the order is too general, vague, and indefinite to be considered as an order which schedules regular overtime that is compensable. It is more in the nature of a condition of the employment, somewhat like telling a school teacher to be on time for the opening of her class, or instructing a school bus driver to have his bus filled with gas and oil in time to start on his route, or telling a mailman or newspaper boy to be at their stations in time to start their deliveries on schedule.

The fact that the local director of the hospital knew that the plaintiffs were reporting early for work does not help them. We held in Bilello v. United States, 174 Ct.Cl. 1253 (1966), that mere knowledge of overtime by an official was not sufficient to enable an employee to recover for overtime in the absence of an order authorizing overtime by an authorized official.

I would deny plaintiffs any recovery and dismiss their petition.

COLLINS, Judge, concurs in the foregoing dissenting opinion.