Skelton, Judge,
dissenting:
I do not agree with the per curiam opinion of the court in this case, because I believe it is contrary to both the law and the facts.
The plaintiffs, who are nursing assistants in a Veterans Administration Hospital, have sued the government for alleged overtime they claim to have worked from May 13, 1962, to December 15,1965, a period of three years, seven months and three days, or a total of 1,011 days.
*668 The case involves the same facts and the same law as was involved in the case of Bates v. United States, 196 Ct. Cl. 362, 450 F. 2d 886 (1971) with one exception. The Bates case was decided by a divided court in favor of the plaintiffs primarily on the basis of a stipulation entered into by the government through error to the effect that the local hospital director had authority to order and schedule regular overtime. After trial, government counsel discovered that the stipulation was erroneous because according to the statutes and regulations, only department heads or staff office heads in Washington, or their designees, could authorize or order the scheduling of regular overtime, and even then it had to be done in writing. The local hospital director had no such authority. The court in Bates refused to allow government counsel to withdraw the stipulation and entered judgment for the plaintiffs on the theory that the local hospital director had the authority to and did in fact order and approve the overtime claimed by the plantiffs as regular overtime. This stipulation does not exist in the instant case. Otherwise the facts and the law are the same as in Bates. While it is true that the plaintiffs in Bates made an alternative plea that the claimed overtime was “irregular” overtime, the majority of the court as then constituted, did not go along with that theory, but decided the case on the basis of the stipulation to the effect that the local director authorized and approved the overtime as “regular” overtime and that he was authorized to do so. Therefore, to that extent, the decision of the court in the instant case that the same type of overtime by the same class of employees under the same circumstances is “irregular” overtime conflicts with the Bates decision where it was held to be “regular” overtime.
The law in the present case is set forth in the opinion of the trial commissioner. In pertinent part the applicable statute and regulations provide as follows:
The Federal Employees Act of 1945, 59 Stat. 295, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1964), recodified in 5 U.S.C. § 5542 (1970), provides in pertinent part:
§ 911. Payment of overtime; rates.
All hours of work officially ordered or approved in excess of forty hours in any administrative work *669 week * * * shall be considered to be overtime work and compensation for such overtime work, * * * shall be * * * [at stated rates]. [Emphasis supplied.] *****
§ 9-1-5. Regulations.
The Civil Service Commission is authorized to issue such regulations, * * * as may ibe necessary for the administration of the -provisions of this chapter * * *.
Pursuant to the above statute, the Civil Service Commission issued regulations which appear in Part 25 of Federal Employees Pay Regulations, 5 C.F.R. §25.221 (1961); 5 C.F.R. § 550.111 (1964), as to how overtime may be authorized as follows:
§ 25.221 Authorization of overtime compensation.
(a) * * *
(b) No overtime in excess of any that may be included in the regularly scheduled administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated. [Emphasis supplied.]
Pursuant to this regulation of the Civil Service Commission, the Veterans Administration specifically delegated the authority to authorize and approve regular overtime only to department heads or staff office heads or their designees in the central office in Washington, D.C. This was done by VA Regulation MP-5 of September 11, 1956, revised June 14, 1965, which provided in pertinent part:
b. Basic 'WorJcweeTc Plus Regular Overtime. A regularly scheduled administrative workweek consisting of the 40-hour basic workweek, plus a period of regular overtime work, may be established for an employee or groups of employees by department heads or staff office heads, or their designees, for their respective personnel within Central Office, and by Directors of Managers of field stations when authorized by their respective department heads. * * *
The same regulation also covered the authorization of “irregular” or “occasional” overtime as follows:
(1) Authorization. Staff office heads, heads of departments, Directors and Managers of field stations * * * or their designees, are authorized to order and approve irregular or occasional overtime.
*670 Definitions of “regular” overtime work and “irregular occasional” overtime work are found in the same regulation as follows:
(a)-' Regular overtime work means overtime work which is regularly scheduled. For this purpose, any overtime work scheduled for an employee in advance of the administrative workweek in which it first is to occur, and which will recur over an extended period of time (at least £ consecutive administrative workweeks) constitutes regular overtime.
(ib) Irregular or oecasional overtime work means overtime work which is not regularly scheduled.
Another regulation of the YA provided that overtime of less than 15 minutes was to be disregarded for pay purposes.[1] This regulation bars most of the claims of the plaintiffs. The trial commissioner found that the plaintiffs spent 13 minutes at the beginning and end of each shift in changing into and out of their uniforms, and each reported 10 minutes early to his ward when on the day or evening shift and 15 minutes early when on the midnight shift. These are separate claims and there is no authority to aggregate them each day. All except the claim for early reporting of 15 minutes by those on the midnight shift are less than 15 minutes and are barred by the above regulation. Neither the trial commissioner nor the court even mentioned this regulation, though the defendant excepted to the failure of the commissioner to do so. It would appear that the court has ignored the regulation because there is no answer to it if the plaintiffs to which it applies are to recover.
As to the claims for the 15 minute early reporting to the wards by those on the midnight shift, they are barred by *671 the de minimis rule. In McIntyre v. Joseph E. Seagram & Sons Co., 72 F. Supp. 366 (W.D. Ky. 1947), the court held that up to 20 minutes was de minimis. We held in Crawford v. United States, 169 Ct. Cl. 546, 564-65 (1965) that 15 minutes was de minimis. See also Ayres v. United States, 186 Ct. Cl. 350 (1968); Carter v. Panama Canal Co., 314 F. Supp. 386 (D.C. Cir. 1970), aff'd 463 F. 2d 1289, cert. denied, 409 U.S. 1012 (1972); Ahearn v. United States, 142 Ct. Cl. 309 (1958); Baca v. United States, 150 Ct. Cl. 70, 78, cert. denied 364 U.S. 892 (1960); and Bantom, v. United States, 165 Ct. Cl. 312 (1964), cert. denied 378 U.S. 890.
It should toe .pointed out that the decision of the court in the instant case is directly in conflict with a portion of the decision of this court in Albright v. United States, 161 Ct. Cl. 356 (1963). In that case a valid order had been issued in writing toy an authorized official requiring the plaintiffs as guards to report 15 minutes early to get their guns, receive instructions and proceed to their posts of duty. The guards had actually reported 20 minutes early and sued for the full 20 minutes as authorized overtime. This court allowed them to recover for the authorized 15 minutes, but denied them any recovery for the 5 minutes that was not authorized in writing. The extra 5 minutes in that case corresponds with and is the same kind of overtime as the entire claimed overtime in the instant case, because it was not approved nor authorized in writing toy an authorized official. The Albright case has not been overruled and we are bound to follow it under the doctrine of stare decisis. But the court totally ignored this part of it, although the defendant called it to the attention of the court.
In the case of Bowling v. United States, 181 Ct. Cl. 968 (1967), this court held:
Thus, the mere fact that plaintiffs might have worked overtime dwring the period herein involved is not de-tenrmnatwe of their right to receive compensation therefor. “* * * the court has not given judgment under this type of overtime legislation (relating to federal employees) unless the work or activity which is the basis of the claim has been authorized, approved, ordered or confirmed toy an authority empowered to do so.” Gaines v. *672 United States, 158 Ct. Cl. 497, 501 (1962), cert. denied, 371 U.S. 936 (1964). [Emphasis supplied.] [Id. at 979.]
See also, Bilello v. United States, 174 Ct. Cl. 1253 (1966); Bamtom v. United States, supra; and Tabbutt v. United States, 121 Ct. Cl. 495 (1952).
We held in the Bilello case that mere knowledge of overtime by an official was not sufficient to support a recovery for overtime by an employee in the absence of an order in writing by an authorized official authorizing or approving the overtime. That is the most that can be said for the plaintiffs in the instant case, as there was no proof that the local hospital director ever approved or authorized the overtime in writing or otherwise, and it is exceedingly doubtful whether there was substantial evidence that he even knew about it.
In addition to the foregoing, the following cogent and compelling reasons show conclusively, in my opinion, that the plaintiffs should not be allowed to recover compensation for the claimed overtime in this case.
The trial commissioner found that the overtime claimed by the plaintiffs had been performed by them each and every day from May 13, 1962, to December 15, 1965 (a period of 3 years, 7 months, and 3 days, or a total of 1,311 days). This service was performed by them with unfailing and uniform regularity every day during this period. There were no interruptions nor irregularities in their daily performance of their uniform changing and early reporting for work during the entire 1,311 days. Each day the claimed overtime performed was the same. It would foe difficult to find any occurrence more “regular” than this, unless it foe the daily revolution of the earth on its axis.
The trial commissioner found and concluded:

Authority to Order and Approve Overtime

28. (a) Under VA regulations in force throughout the claim period, neither the Hospital Director nor his designees had any authority to order or approve “regularly scheduled overtime”, or “regular overtime work”. During the claim period, the Hospital Director had authority to establish regularly scheduled workweeks which included “regularly scheduled overtime” or “regular overtime work” only with the approval of his depart *673 ment bead (the Chief of the Bureau of Medicine and Surgery, VA). Evidence of any delegation of such authority to the Hospital Director, or any here relevant request for such approval, is wholly absent. Evidence that any departmental level official with authority to order or approve “regularly scheduled overtime” or “regular overtime work” was cognizant of either the “uniform change” or “early reporting on ward” practices at the Hospital is also wholly absent.
The court has approved and adopted these findings and conclusions of the commissioner, and has in fact expressly conceded that they are correct by saying in its opinion:
The Act [Federal Employees Pay Act of 1945, supra] authorizes overtime compensation only for “hours of work officially ordered or approved in excess of forty hours in any administrative work week”. It is conceded and not in issue here that hours of work not so officially ordered or approved, however onerous, are not com-pensable, and moreover, if the person who ordered or approved the work was a subordinate in the agency, a proper written delegation of authority to him must appear. 5 C.F.R. 25.221(b) (1961); Bowling v. United States, 181 Ct. Cl. 968 (1967).
These findings of fact and conclusions of law, along with other facts, the statute and the regulations quoted above, foreclose and cut off the claims of the plaintiffs for overtime in this case. The overtime, although regular, is not compensable. Under these facts and the law, the court should be bound and compelled to enter judgment denying any recovery to the plaintiffs and dismissing their petition.
But the court has ignored the provisions of the statute and the regulations and has allowed the plaintiffs to recover on a theory not even dreamed of by the plaintiffs when they filed their suit. The court has accomplished this result by saying that the overtime performed with uninterrupted daily regularity for over three years and seven months (1,311 days) was “irregular” overtime! In other words, the court says that the overtime performed daily over this long period of time, although “regular” was “irregular.”
The government says that calling overtime that is obviously regular “irregular” turns words “inside out.” This *674 puts it mildly and is an understatement. In my opinion, it is reckictio ad dbsv/rdwm.
It is obvious that the court was determined to enter judgment for the plaintiffs even though the law and the facts required a decision against them. This is shown ’by the language of the court’s opinion where it speaks of “equity here requires that the natural consequences should be drawn from defendant’s failure to schedule the overtime” and of “orders issued that ought to have been issued.” This is the same as saying that in the opinion of the court the VA officials should have scheduled the overtime as “regular approved overtime” and since they did not do so, the court is deciding the case for the plaintiffs in such a way that the result for the plaintiffs is the same as if the overtime had been so scheduled and approved. This assumes an omnipotent role for the court wherein it places itself above the VA and Congress on a matter that involves discretion and judgment that Congress has placed solely within the jurisdiction of the agency. To carry out its determination to enter judgment for the plaintiffs, the court could not hold that the overtime was “regular” and approved by an authorized official in view of the conclusive provisions of the law and the uncontra-dicted and overwhelming facts in the case. The only way the court could rule for the plaintiffs was for it to take the absurd position that the overtime that had been as “regular” as the rising and setting sun for 1,311 days was “irregular.” This it has done.
Any school boy knows that the meaning of “irregular” is the opposite of “regular,” and that it means “occasional” or “at irregular intervals.” In fact, the applicable regulation quoted above defines “irregular” as being “occasional.” If there is any uncertainty about determining its meaning, which seems to be unbelievable, a cursory examination of any standard dictionary would solve the problem. For instance, Webster’s Third New International Dictionary, 1967, defines “irregular” as:
* * * [Ljacking continuity or regularity of occurrence * * *• failing to occur at regular or normal intervals. * * *
*675 To say that the overtime that regularly occurred daily for 1,311 days .without -interruption was “irregular” within the meaning of this definition is, in my opinion, so absurd as to -be almost comical. It reminds me of a comic strip in a local newspaper a few days ago wherein the comic characters were discussing breakfast cereal. One of the characters asked the other “Is this cold “hot” cereal, or hot “cold” cereal?” In the same vein, the question could logically be asked here “does the court mean to hold that the overtime in this case is -regular “irregular” overtime, or is it irregular “regular” overtime?” I hope the officials of the VA can understand it. Frankly, it is beyond my powers of comprehension to understand how the overtime here which is so patently “regular,” could -be “irregular.” I am afraid that the court’s decision in this case will result in 'hopeless confusion in this phase of the law. In the court’s decisions in Albright, supra; Baylor v. United States, 198 Ct. Cl. 331 (1972); Bates, supra; and in this case, the court has taken almost every conceivable position with regard to overtime. Consequently, an employee seeking overtime can likely find an opinion of this court that fits his situation regardless of what it may ibe. In the meantime, the agencies of the -government must be utterly bewildered ’as to 'how to handle the hours of work and the .pay of their hundreds of thousands of employees, in addition to the budgetary problems involved.
In my opinion, the decision of the court in calling the overtime “irregular” when it is unquestionably “regular” is about as logical (or illogical) as the reasoning in the following rjingle:
Regular is irregular in this case,
Although irregular is regular on its face.
When irregular is regular, too,
Regular becomes irregular -if you sue.
If you assume hot is cold, black is white,
Long is short, day is night,
■Up is down, fat is thin,
And regular is -irregular, you can win.
Needless to say, I would enter judgment for the defendant and dismiss plaintiffs’ petition.
Bennett, Judge, joins in the foregoing dissenting opinion.
*676 FINDINGS of Fact
1. (a) Plaintiffs in this cause sue to recover overtime compensation, pursuant to the provisions oi the Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended, 5 U.S.C. §911 (1964), for the respective periods of their employment as nursing assistants at the Fort Meade, South Dakota, Veterans Administration Hospital (“the Hospital”) between May 13,1962, and December 15,1965.[1] Their contention is that, during the said period, they were “regularly ordered, required and induced by their duly authorized superiors and the rules and regulations of the Veterans Administration Hospital to report to the hospital each working day a substantial period of time prior to the commencement of their regularly scheduled shifts and to remain after the end of each such shift to perform necessary, directed duties and functions of their employment * * More specifically, plaintiffs assert that (1) time required prior to the start of, and after the end of, each working day in changing at the Hospital into, and out of, uniforms which could not be worn away from the Hospital, and (2) “required attendance in assigned ward prior to commencement of shift”,[2] constitute compensable overtime.[3]
(b) Defendant’s position is that no plaintiff performed more than 40 hours’ compensable work in any workweek during the claim period; that no overtime work was ordered or approved by any official with authority to do so; that the claims here asserted are in any event barred by laches or estoppel; and that, assuming “any unpaid overtime which the Court might otherwise hold to be compensable work”, defendant is entitled to offset against such overtime “substantial periods of paid duty-free time * * *” assertedly allowed plaintiffs.
(c) No plaintiff has been compensated for any of the “overtime” here claimed.
*677 (d) Trial of this cause was limited to the issues of law and fact relating to plaintiffs’ right to recover, with determination of the amount of recovery, if any, reserved for further proceedings.
2. (a) During all or part of the period relevant to this case, some 103 of the 116 plaintiffs named in the petition (including the three mentioned in finding 2(c)) were employed by defendant in the classified Civil Service as nursing assistants at the Hospital.
(b) Plaintiffs Harold D. Arehart (2), Gordon W. Berle (or Bierle) (7), LaVerne H. Bierle (8), James W. Blakeman (9), James C. Chapman (16), Harry B. Dennis (27), Richard D. Evans (30), Kenneth H. Long (56), Wesley B. Printz (85), Bobert M. Skinner (97), Neis W. Swenson (102), Herbert Wiege (113), and Wayne H. Yates (115), were not so employed by defendant at any time here relevant.
(c) Plaintiffs Harold B. Gray (36) and Melvin M. Paw-lowski (78) died prior to the commencement of this action. Plaintiff Fred N. Harlow (39) died prior to April 1970. No application for substitution of the proper party or parties pursuant to Buie 66 has been made as to any plaintiff named in the petition.
3. During the claim period the Hospital was a 720-bed capacity, neuropsychiatric, facility. Patients at the Hospital were mentally ill, and accordingly presented special behavior problems (e.g., excitability, retardation, aggression, hostility, defiance, depression, or fear). Some also required medical or surgical treatment and care.
4. Insofar as presently relevant, the organizational structure of the Hospital during the claim period consisted of a Hospital Director, an Assistant Hospital Director, a Chief of Staff (responsible for medical treatment of patients) , and chiefs of divisions and services (e.g., personnel and nursing). The organizational structure of the Nursing Service consisted of a Chief Nurse, Assistant Chief Nurse, day, night, and evening supervisors, head nurses (generally speaking, one on each of the several units, or wards, at the Hospital), staff nurses, and nursing assistants. Nursing assistants were thus subject to the authority of the Chief Nurse, who established rules and regulations governing them. Super *678 visors in the office of the Chief Nurse were responsible for insuring that nursing assistants observed such rules and regulations. For many years prior to, and throughout, the claim period, there was within the Nursing Service an Associate Chief, Nursing Service for Education, under the immediate supervision of the Chief Nurse, whose responsibilities included the planning and implementation of an orientation and educational program for nursing personnel (including nursing assistants) .[4]
5. During the claim period, nursing assistants worked under the direct supervision of the head nurse and other nurses assigned to the unit, or ward. Their duties involved principally personal care of patients (e.g., bathing, bedmaking, feeding, measurements of temperature, blood pressure, pulse, and respiration, and the like); care of patients’ environment (keeping the patients’ units clean and orderly and keeping work areas, utility rooms, linen rooms and offices neat and orderly), and care for patients’ safety. Abuse or mistreatment of patients by any Hospital employee was forbidden.
6. (a) Although there were a number of shifts at the Hospital throughout the claim period,[5] most of the 130 to 150 nursing assistants employed there worked on one of three basic shifts: 7:30 a.m. to 4:00 p.m. (“the day shift”) ; 3 :30 p.m. to midnight (“the evening shift”); or 12:00 midnight to 8:00 a.m. (“the midnight shift”). An off-duty, unpaid, lunch period of 30 minutes was afforded to nursing assistants working the day and evening shifts. Although nursing assistants working the midnight shift were permitted to eat “lunch”, during paid time, in the area of the ward to which assigned, no lunch period was scheduled, and no off-duty period for eating was provided, for nursing assistants working that shift. Usually, nursing assistants spent 10 to 15 minutes each night, during slack time, eating lunch on the midnight shift.
(b) Nursing assistants at the Hospital were required to work any “tour of duty” necessary to meet Hospital needs, and were therefore subject to periodic rotation from one *679 shift to another. The majority of them, however, worked on the day shift.
(c) Hospital publications[6] in force throughout most of the claim period advised nursing assistants that:
The hours of duty for aides are continuous, and of eight hour duration. You work a forty-hour week, and for any service in excess of forty hours, you will receive one and one-half times the basic rate of pay, or compensatory time for each hour of overtime worked.
7. (a) During the claim period, nursing assistants at the Hospital were furnished, and were required by written Hospital instructions to wear when working, government-owned uniforms. For male nursing assistants the uniform consisted of white trousers and a white blouse, to be worn with the nursing assistant’s own black or brown oxford or lace shoes with rubber heels. Female nursing assistants wore white cotton uniforms, with black or brown oxford shoes and beige hose.
(b) Each nursing assistant was furnished six uniforms. Free laundry service for the uniforms was provided by defendant. During the cleaning process, the uniforms were liberally starched and closely pressed. Each nursing assistant was instructed to wear only a clean uniform, and to present a clean, neat, and well-groomed appearance at all times.
(c) Throughout the claim period, male nursing assistants were prohibited from wearing their uniform “off the station”, including going to and from work. At the outset of the claim period, female nursing assistants were permitted to wear their uniforms off the station, because lockers had not then been provided for them, but commencing in or after 1963, as lockers did become available, they too were for a time prohibited from wearing uniforms “off the station.”
(d) Male nursing assistant plaintiffs (and, when not permitted to wear uniforms in travel to and from work, female nursing assistant plaintiffs) changed from personal clothing into (and out of) uniform, in locker rooms at the Hospital, *680 where each nursing assistant plaintiff employed as such during the claim period was (at least at some time during that period) assigned a locker. Shower facilities and Hospital towels were also made available. The change into (and out of) uniform, when performed at the Hospital, necessarily occurred before (and after) the nursing assistant’s scheduled “tour of duty”, or shift, commenced (and ended).
(e) A 1964 Orientation Fact Sheet for Nursing Assistants published at the Hospital reflects that nursing assistants were expected to “set a good example for the patients * * *” and must therefore “be in proper uniform and well groomed at all times.” The Orientation Fact Sheet also stated that:
You are requested to bathe, change underwear and hose, and use a deodorant daily. Male nursing assistants will shave daily.
8. (a) By Administrative Services Letter 65-133, dated November 26,1965, the Director for Administrative Services, Veterans Administration, Washington, D.O., informed (among others) all VA Hospital Directors that:
SUBJ: Overtime Compensation for Early Deporting
1. In the past few months, we have received a number of inquiries regarding “dress-up time” before scheduled tours of duty.
2. Classification Act employees are entitled to overtime compensation for all hours of employment officially ordered or approved in excess of forty hours per week. * * *
3. In a number of VA work situations, the wearing of uniforms is a condition of employment. While a person may be required to wear a uniform, he may not be required to report early for the purpose of donning a uniform unless he is placed in a pay status.
4. The possible need for making overtime payments in situations of this type has been pointed out in a * * * decision * * * published as 44 Comp. Gen. 195 [ (1964), denying] overtime compensation to certain employees who arrived for work ahead of time in order to change into appropriate clothing since they had not been officially ordered to arrive prior to the time necessary for actually reporting on duty * * * [but holding that] other employees who had been officially ordered to arrive early were entitled to overtime compensation for the *681 additional fifteen minutes they worked each, day as a result of the “early reporting” requirement.
* Hi sfc * *
6. In view of the considerations outlined above, Personnel Officers and management officials are reminded that any early reporting officially ordered or approved is considered to constitute duty which is payable at the overtime rate if it thereby lengthens the normally prescribed tour of duty beyond that payable at straight time rates.
(b) By Policy Memorandum No. 65-3, dated December lg>, 1965,[7] the Hospital Director stated in part that:
UNIFORMS
I. INTRODUCTION: The purpose of this memorandum is to set forth this station’s procedures on the proper use and care of government issued uniforms and to make it optional with the employee whether they change into uniform at home or at the station.
II. POLICY: Employees in certain type positions are issued uniforms Which they are required to wear during the performance of their duties. The policy of this station is to allow employees to wear these uniforms to and from work. By doing this, employees will be able to report directly to and from work areas without having to change clothes first. Individual lockers will still be available if employees wish to change into their uniforms at the hospital. This will have to be done on their own time.
*****
9. Counsel for the parties are agreed that throughout the claim period (a) it took some time to change into, and out of, uniform at the Hospital, and (b) an averaging approach to that problem is proper. Plaintiffs propose a total of 16 minutes per working day for this activity. Defendant, although preferring “a finding * * * that limite total ‘dressing’ time to 10 minutes, * * * has proposed a finding * * * of 11 minutes * * It is reasonable to conclude that the time spent in changing into, and out of, uniform[8] each work *682 ing day varied in amount from plaintiff to plaintiff, or even from time to time as to an individual plaintiff (due to seasonal variations, dissimilar condition of looker rooms, or the like). In the circumstances, the averaging approach acceptable to the parties is approved and adopted as a reasonable and practical answer to an otherwise almost insoluble problem. Based on the foregoing considerations, and the record as a whole, it is found that during the claim period each plaintiff who was required to change into, and out of, uniform at the Hospital reasonably spent, on the average, a total of 13 minutes per working day in that activity.
10. (a) The Hospital Director was personally aware that throughout the claim period each plaintiff employed as a nursing assistant at the Hospital (except a female nursing assistant when permitted to wear her uniform off the station) was required by Hospital policy and written instructions each working day to change into (and out of) his or her uniform before (and after) the beginning (and end) of his or her scheduled tour of duty, and at least tacitly, approved the practice.
(b) There is no evidence that during the claim period anyone in a position of authority in the Veterans Administration, Washington, D.C., was specifically aware of the Hospital’s uniform change instructions.
11. For many years prior to, and throughout most if not all of, the claim period, newly employed nursing assistants at the Hospital underwent a Basic Orientation Program (generally, of about 90 hours’ duration) under the direction of the Associate Chief, Nursing Service for Education. During (and after) the Orientation Program, it was made clear that the first activity for a nursing assistant coming on duty on any shift was to “receive the report.” The “report” was a status report on ward and patient conditions given by a nurse to the nursing assistants assigned to that ward. A nursing assistant coming on duty might, however, also receive a further report from one going off duty.
12. (a) Throughout the claim period, nursing assistants coming on duty to work on the day shift (7:30 a.m. to 4:00 p.m.) had a half-hour overlap with nursing assistants working the midnight shift (12:00 midnight to 8:00 a.m.), *683 and nursing assistants coming on duty to work on the evening shift (3:30 p.m. to midnight) had a half-hour overlap with nursing assistants working the day shift. The evening shift, however, was scheduled to get off work at the same time the midnight shift was scheduled to begin work. It is reasonable to conclude that, to the extent nursing assistants worked other than one of the three basic shifts (e.g., one nursing assistant plaintiff normally worked from 6:00 a.m. to 2:30 p.m.), the overlap in time between the on-coming and off-going nursing assistants was more than one-half hour.
(b) In the normal course of events, the first order of business for an on-coming nursing assistant was to “receive the report” from a nurse on his or her assigned unit or ward, to receive an assignment for his or her tour of duty, and then, on the day or evening shift, to meet (in the ward, in the dining room, or in whatever area the patients then were) and on the midnight shift to “make rounds” with, the off-going nursing assistant (to check the number of patients present, to receive information or instructions concerning patients, to check ward conditions, on locked wards to verify security measures and the like). These activities after the nurse’s “report” generally required a total of 15 minutes, more or less.
13. (a) Minutes of (Nursing) Supervisors’ Meetings at the Hospital during the claim period reflect in part as follows:
1. Meeting of July 31,1962:
9. Locking Wards at Night: All wards should be locked at 10 P.M. and a check made of each individual patient, * * *. This does not eliminate the regular rounds and bed check made by the nurse and made jointly by the two shifts before the P.M. shift goes off. * * *
2. Meeting of June 4,1963:
5. Reporting for Duty. When do you report for duty ? Do you report the very minute your tour begins or do you report in time to receive an adequate report from the off-going staff? A little soul-searching may be well in this area also. The nurse should set the example.
*684 3. Meeting of July 14,1964:
>5. Reporting on Duty 10 Minutes Prior to the Actual Tour: Please discuss this on the wards and ask yourself if you would like the oncoming personnel to come on early enough so you can give them report and make rounds with them so they determine whether they want to accept the ward as you are leaving it. It seems only courteous that we should all come on duty a little early so the off-going tours can go home on time.
4. Meeting of September 7,1965:
3. Reporting for duty. Are we reporting early enough to receive a report and make rounds with the off-going crew ? This is important.
(b) During the claim period, Minutes of Nursing Supervisors’ Meetings at the Hospital were signed by the Chief Nurse as presiding, and the Assistant Chief Nurse as recording. Shortly after each such meeting, the substance of the Minutes was given verbally at meetings of head nurses, and a copy of the Minutes of each such meeting was ultimately posted on each unit, or ward, at the Hospital. While the Hospital Director did not recall seeing any specific Minutes of such meetings, he regularly received, and reviewed, Minutes of such meetings to familiarize himself with what was happening at the Hospital.
14. It is clear that most if not all of the nursing assistant plaintiffs actually employed by defendant as such during the claim period reached their assigned wards “a few minutes early” on :all shifts. It is equally clear that nursing assistant plaintiffs assigned to the midnight shift were “requested”, encouraged, and in fact induced and coerced by Hospital supervisory personnel to report to the ward some 15 minutes prior to midnight, in order that they might “receive the report”, make rounds with the off-going nursing assistants, check the ward, and the like, prior to midnight. There is, however, a sharp conflict in the evidence whether nursing assistants assigned to the day and evening shifts were so “requested”, encouraged, induced, or coerced, to report to the ward prior to the commencement of their scheduled tour of duty.
15. Upon a weighing and evaluation of the sharply conflicting proof, it is concluded that throughout the claim *685 period (a) nursing assistant plaintiffs at the Hospital reasonably understood, from oral advice from supervisory personnel, from the Minutes of Supervisors’ Meetings, and in accordance with longstanding practice, that they should report (as in fact they did) to the ward, in uniform, at least 10 minutes prior to the commencement of their assigned shift if assigned to the day or evening shift, and at least 15 minutes prior to the commencement of their assigned shift if assigned to the midnight shift, and (b) that when all nursing assistants assigned to a ward reached that ward shortly prior to commencement of their scheduled tour of duty, preshift work activities (in the form of receiving the report, receiving work assignments, ward inspection, patient inspection and care, 'and the like) commenced.[9]
16. As a matter of Hospital policy throughout the claim period, nursing assistant plaintiffs were generally given an opportunity to take two coffee breaks, to a prescribed maximum of 10 minutes per break, during each tour of duty, patient care permitting. Such breaks were regarded not as a right but as a privilege, to be taken if, and when, the overriding duty of patient care permitted. Such breaks were not scheduled, and when taken were normally taken on the ward, or at the nursing station near the patient area. Some wards had community coffee pots, and Hospital employees (nurses and nursing assistants) contributed to >a ward coffee fund. When patient care necessitated, a coffee break was, of course, interrupted. Most of the time, nursing assistant plaintiffs taking a coffee break were able to complete it without interruption, but not infrequently patient care necessitated otherwise. On occasion during coffee breaks, nursing assistant plaintiffs received instructions from nurses, read Hospital publications, or received equipment for use on the ward. On some days, patient demands precluded any coffee breaks at all.
*686 17. There is no credible evidence that, prior to 1966, nursing assistants at the Hospital presented any complaints or objections to the Hospital Director, the Assistant Hospital Director, the Chief of Staff, or the Chief Nurse, respecting either “uniform change time” or “early reporting on ward”.
18. A VA regulation (MP-5, Chapter 8, Section A, “Hours of Duty”), in force throughout the claim period, provided in part that all employees were expected “to be on duty during the full period of their tours of duty unless absent on approved leave”, and “to observe the opening and closing hours established for the tour of duty * * *.” Hospital Administrative Memoranda in force throughout the claim period contained substantially identical provisions.
19. In the course of pretrial proceedings in this cause, counsel for defendant advised counsel for plaintiffs, in 1969, that the Hospital Director and the Assistant Hospital Director were authorized to order or approve overtime for plaintiffs. Prior to trial in 1970, however, counsel for defendant further advised counsel for plaintiffs that, according to the VA, “VA regulations do not authorize even Hospital Directors to approve overtime on a regular basis”, and that, throughout the claim period, the Chief Medical Director for the VA, or in his absence his Deputy, was the lowest ranking officer authorized to approve regularly scheduled overtime for plaintiffs. Thus, unlike Bates v. United States, 196 Ct. Cl. 362, 450 F.2d 886 (1971), that the Hospital Director had unqualified authority “to order and approve overtime during the claim period at the subject hospital” was not stipulated to, either prior to or at trial.
20. The Federal Employees Pay Act of 1945, supra, as in force throughout the claim period, provided in part that:
All hours of work officially ordered or approved in excess of forty hours in any administrative workweek * * * shall be considered to be overtime work and compensation for such overtime work * * * shall be [at stated rates] * * *.
21. The Veterans Administration had two sets of regulations in effect during the claim period concerning overtime work of its employees. Regulation MP-5, Chapter 610, set out policies and instructions regarding the establishment of *687 hours of duty, including overtime hours, within the VA. Regulation MP-4, Chapter 610, set out procedures to be followed for approval of overtime.
22. Paragraph 7, Regulation MP-5, September 11, 1956, as in effect throughout most of the claim period, provided in part as follows:
7. OVERTIME
All hours of work officially ordered or approved in excess of 40 hours in any administrative workweek * * * shall be considered to be overtime work. Overtime is considered an expedient to be used only under conditions wherein necessary operations cannot be performed through planned coverage by on-duty personnel during their regular 40-hour basic workweek. Supervisory personnel must obtain proper authorization for overtime before permitting or requiring the performance of overtime work by an employee. Heads of departments and other top staff officials are authorized to prescribe, in their responsible areas, such limitations as are necessary to provide control and prevent abuse of the use of paid overtime. Each responsible official must adhere to a policy of authorizing only such paid overtime as can be readily demonstrated as wholly supported from the standpoint of emergency and/or efficiency in carrying out his responsibilities, and with due regard to cost and the availability of current funds.
23. (a) Essentially the same provisions quoted in finding 22 were contained in a revision of Regulation MP-5 issued June 14,1965. Definitions of regular, and irregular or occasional, overtime work in such revision[10] were as follows:
(a) Regular overtime work means overtime work which is regularly scheduled. For this purpose, any overtime work scheduled for an employee in advance of the *688 administrative workweek in wbicb it first is to occur, and whicli will recur over an extended period of time (at least 2 consecutive administrative workweeks) constitutes regular overtime.
(b) Irregular or occasional overtime work means overtime work which is not regularly scheduled.
(b) Paragraph 5(b) of the June 14, 1965, revision of Eegulation MP-5 provided as follows:
b. Basic Workweek Plus Regular Overtime. A regularly scheduled administrative workweek consisting of the 40-hour basic workweek, plus a period of regular overtime work, may be established for an employee or groups of employees by department heads or staff office heads, or their designees, for their respective personnel within Central Office, and by Directors or Managers of field stations when authorized by their respective department heads. For purposes of leave and overtime pay administration, the authorization shall specify for such employee (s) , by calendar days and number of hours a day, the periods included in the regularly scheduled administrative workweek which do not constitute a part of the basic workweek. Compensatory time off m lieu of premium pay may not be granted for such overtime work (See definition of “regular overtime work”, par. 4d(1) (a)).
(c) Paragraph 7(b) (1) of the June 14, 1965[11] revision of Regulation MP-5 provided as follows:
(1) Authorization. Staff office heads, heads of departments, Directors and Managers of field stations * * * or their designees, are authorized to order and approve irregular or occasional overtime.
24. Regulation MP-4, in effect during the claim period, set out the procedure to obtain authorization for overtime compensation. Paragraph 6B.01(a) provided in part:
* * * The performance of overtime in excess of the administrative workweek will be authorized by competent authority, except in emergencies. In the latter event, retroactive confirmation will be obtained in writing.* * *
*689 Paragraph. 6B.01 (b) set out the procedure for processing VA Form 1098 (Request for and Authorization of Overtime Work). It provided that the nature of the duties to be performed and the justification for the overtime were to be indicated by the requesting official over his signature. Two copies of the request were to be forwarded to the appropriate official at the field station who could approve or obtain approval of the overtime. If the request was approved, the “authorized” block was to be completed and the forms forwarded to Finance for necessary action, after which the original was to be returned to the requesting office for audit purposes.
25. (a) Hospital regulations, in force throughout the claim period and signed by the Assistant Hospital Director, provided in pertinent part that overtime would be approved only by the Hospital Director “or his designees,” and that “Each responsible official must adhere to the policy of authorizing only such paid overtime as can be readily supported from the standpoint of emergency and/or efficiency of operation, with due regard to cost and availability of current funds.” The said regulations defined overtime work as “All hours of work officially ordered or approved in excess of the established basic workweek * *
(b) By amendment, effective February 26, 1965, to Hospital regulations theretofore in force, the Hospital Director prescribed a regulation in part providing that “For paid overtime, the requesting official will be the Division or Service Chief”, and that “The approving official in all instances of paid overtime will be the Assistant Hospital Director * * The Chief Nurse was the “Division or Service Chief” for nursing assistant plaintiffs. The 1965 amendment remained in force throughout the balance of the claim period.
26. (a) In April and May 1966, the plaintiffs named in the petition executed, and on June 2,1966, a representative of a federal employees’ organization forwarded to the VA (via the Hospital Director), a claim for overtime pay, citing Comptroller General’s Decision B-155197, October 8, 1964 (44 Comp. Gen. 195) (finding 8(a)). Generally speaking, 20 minutes per day worked was stated to be the “extra amount of overtime claimed.”
*690 (b) In. August 1966, the YA returned the claims to a representative of that organization with the advice that “the employees do not have any service that may be recognized as overtime work.”
(c) By letter dated September 29, 1966, the president of that organization forwarded to the General Accounting Office a “claim file” which included 118 separate signed claims for overtime pay. By separate settlement certificates dated October 27,1966, each of the claims was denied by the Claims Division, General Accounting Office. Inter alia, each settlement certificate stated that:
It is administratively reported that the policy of the hospital did not require you to report early for the purpose of changing into your uniform. You were free to change into or out of your uniform at home or at the hospital. The only requirement made by the hospital was that you report ready for work in uniform, when your tour of duty started. No overtime was ordered or approved for the time spent changing into or out of your uniform.
While your claim discloses that you were cautioned not to wear your uniform uptown, etc., and that as a courtesy between employees it was considered proper to report a few minutes early so that the off going employees could leave promptly, you may have felt compelled to report to work early each day. However, applying the criteria set forth by the Court in the Bilello case, it must be concluded that the mere existence of a practice to report to work early based on a common understanding regarding the wearing of uniforms between home and work is not tantamount to express or implied direction by an officer to work overtime. See also Albright, et al. v. The United States, 161 Ct. Cl. 356.
In view of the above, no part of your claim may be allowed.
(d) This action, filed May 13,1968, followed.
ULTIMATE FINDINGS AND CONCLUSIONS

Hours of Worlc

27. (a) Plaintiffs actually employed by defendant as nursing assistants at the Hospital during the claim period were required (findings 7-10), and induced (findings 11- *691 15), by Hospital supervisory personnel to devote, on the average, a total of 23 minutes each working day in excess of 'a scheduled 8-hour tour of duty on the day or evening shift, and a total of 28 minutes each working day in excess of a scheduled 8-hour tour of duty on the midnight shift, to preshift and postshift activities essential to, and directly connected with, their jobs as nursing assistants, and “necessarily, primarily, and predominantly for their employer’s benefit.” Baylor v. United States, 198 Ct. Cl. 331, 358 (1972). The time so spent constituted overtime “hours of work” within the meaning of the Federal Employees Pay Act of 1945, supra. Baylor v. United States, supra; Bates v. United States, supra. Cf. Carter v. Panama Canal Co., 463 F. 2d 1289 (D.C. Cir. 1972), cert. denied, 409 U.S. 1012.
(b) The Hospital ¡Director was specifically aware of, and at least tacitly approved, written Hospital instructions requiring preshift and postshift uniform change time. The Hospital Director also knew of, and took no action to disavow or change, oral and written actions and instructions of the Chief Nurse and other Hospital supervisory personnel inducing preshift early reporting on the ward in uniform. Cf. Byrnes v. United States, 163 Ct. Cl. 167, 173, 324 F. 2d 966, 968 (1963), and cases there cited.

Authority To Order and Approve Overtime

28. (a) Under VA regulations in force throughout the claim period, neither the Hospital Director nor his designees had any authority to order or approve “regularly scheduled overtime”, or “regular overtime work”. During the claim period, the Hospital Director had authority to establish regularly scheduled workweeks which included “regularly scheduled overtime” or “regular overtime work” only with the approval of his department head (the Chief of the Bureau of Medicine and Surgery, VA). Evidence of any delegation of such authority to the Hospital Director, or any here relevant request for such approval, is wholly absent. Evidence that any departmental level official with authority to order or approve “regularly scheduled overtime” or “regular overtime work” was cognizant of either the “uniform *692 change” or “early reporting on ward” practices at the Hospital is also wholly absent.
(b) Under VA regulations in force throughout the claim period, the Hospital Director did have authority to order and approve “irregular or occasional overtime.”
29. (a) That most plaintiffs performed overtime “hours of work” during the claim period is not determinative, in and of itself, of their right to recover. Baylor v. United States, supra, at p. 361, and cases there cited. Proof that such “hours of work” were ordered or approved by an official possessed of authority to do so is also a prerequisite to defendant’s liability to compensate plaintiffs therefor. Baylor v. United States, supra; Bates v. United States, supra; Bowling v. United States, 181 Ct. Cl. 968 (1967).
(b) Plaintiffs do not urge that VA officials at the department level here ordered or approved the overtime work for which compensation is sought. They rely, rather, on the authority of the Hospital Director or his designees.[12] Defendant contends that, assuming plaintiffs worked overtime, such work was not validly “ordered or approved.”
30. (a) Plaintiffs broadly assert that both the “uniform rule and the early reporting rules involved in this case were issued by * * * [Hospital] officials * * * duly authorized to order and approve overtime.”[13] While literally accurate, that assertion is too simplistic to be of any value in the deci-sional process. See Bates v. United States, supra. The central question, precisely defined, is whether the Hospital Director (or his designees) had any authority to order or approve overtime work of the nature here involved. Ibid; Bowling v. United States, supra.
(b) Plaintiffs also aver that in this case, as in Bates, defendant '•'•similarly stipulated that the Hospital Director or his designee * * * were authorized to order and approve overtime for plaintiffs herein * * *”,[14] and, apparently, that Bates therefore necessarily governs the outcome of this case. That argument is a fallacious one. The stipulation at the *693 core of the majority per curiam decision in Bates is unavailable to tbe plaintiffs herein. Too, plaintiffs’ summary dismissal of focus on the type of overtime involved as mere “hair-splitting”[15] must be, and is, rejected. The issue stated in finding 30(a), noted in but not definitively resolved by Bates, must squarely be met in deciding this case.
31. (a) Civil Service Commission regulations in force throughout the claim period provided in substance that overtime work in excess of any that might be included in the regularly scheduled administrative workweek should be ordered or approved only by an officer or employee to whom such authority had been specifically delegated.[16]
(b) For reasons which are apparent, VA regulations in force during the claim period do not speak directly to “authority to order or approve overtime not recognized at the time as being overtime * * Bates v. United States, supra, 196 Ct. Cl. at 363, 450 F.2d at 887. Literally, plaintiffs’ “hours of work” fall within the VA definition of “irregular or occasional overtime work”, which the Hospital Director had authority to order and approve, for such hours were, albeit regular enough, indisputably not “overtime work * * * regularly scheduled” as a part of any plaintiff’s administrative workweek. Finding 23.
(c) The phrase “irregular or occasional” overtime work does not normally suggest predictable and regularly recurring overtime, especially when recurrence extends over a prolonged period. Cf. Bates v. United States, supra (dissenting opinion); Byrnes v. United States, supra; Adams v. United States, 162 Ct. Cl. 766 (1963); Anderson v. United States, 136 Ct. Cl. 365 (1956). Defendant advances no valid reason for departing from the literal language of the VA regulations in this case, however, and none appears. Thus, there was a literal, specific, delegation of authority to the Hospital Director to order and approve the overtime work here in suit.
(d) The issue is difficult, and close. The majority per curiam and dissenting opinions in Bates reflect conflicting views as to its proper resolution. Defendant was the author *694 of tbe regulations, and it, by high, ranking (if field level) authority exacted overtime work. It is therefore neither just nor right to strain for a technical and artificial interpretation of them when their natural meaning is, if perhaps unanticipated, at least clear.
(e) After careful scrutiny of the statutory and regulatory pattern, and the entire record, it is concluded that throughout the claim period the Hospital Director possessed, and exercised, sufficient authority to order and approve the overtime “hours of work” performed by most plaintiffs[17] at the Hospital during the said period to trigger an obligation on the part of defendant to pay for any such overtime “hours of work” properly claimed.[18] See Baylor v. United States, supra; Bates v. United States, supra; cf. Bowling v. United States, supra.

Offsets

32. Defendant contends that it is entitled to offset, against any overtime hours of work officially ordered or approved, paid “duty-free” time assertedly available to nursing assistant plaintiffs for (a) coffee breaks on all shifts, and (b) “lunch” on the midnight shift. The facts respecting coffee break and midnight shift “lunch” times are set forth in findings 6(a) and 16. While this issue, too, is not free from doubt, in the light of the cases cited in Baylor v. United States, supra, at 364 it is clear from the record that (insofar as relevant to defendant’s present contention), plaintiffs were considered to be officially on duty and subject to call and interruptions at all times during such breaks; that interruptions in fact occurred; that patient demands at least at times precluded coffee breaks; that during coffee breaks actual work occurred, at least at times; that midnight shift “lunch” had to be consumed on the assigned wards; and that defendant furnished no “completely free time when they were not actually required to perform duties at their assigned posts * * Baylor v. United States, supra at 363. In the circumstances here as there, any offset for paid time allowed and taken by plaintiffs during the claim period would *695 be “inappropriate”. Ibid. Nor is any de minimis argument valid. Ibid.

Laches and Estoppel

33. Defendant also urges that, in any event, plaintiffs are estopped from asserting the claims sued upon, and that the claims are barred by laches. These arguments, too, must be rejected. Detling v. United States, 193 Ct. Cl. 125, 131-32, 432 F.2d 462, 465-66 (1970); Albright v. United States, 161 Ct. d. 356, 362-63 (1963); Parmenter v. United States, 125 Ct. Cl. 35 (1953).
Conclusion or Law
Upon the foregoing findings of fact and ultimate findings and conclusions, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs (except those named in finding 2 (b) and (c)) are entitled to recover, and judgment is entered to that effect. Unless the parties stipulate the amount of recovery due each such plaintiff, that amount is to be determined in further proceedings pursuant to Rule 131(c) in accordance with this opinion.
The court further concludes as a matter of law that the plaintiffs named in finding 2 (b) and (c) are not entitled to recover, and the petition as to such plaintiffs is dismissed.

 1 do not Rave this regulation before me, but it was described In Defendant's Exhibit No. 30 in this case. That exhibit Is a letter from R. W. Wise, the Controller of the VA, dated August 9, 1966, to Mr. John J. Donovan, a union official, rejecting the claims of the plaintiffs In which It Is stated:
“Under the present laws, which provide for overtime pay for Government employees, agency officials may prescribe by regulations the minimum amount of work that will be regarded as overtime service. This authority is declared to exist In 44 Comp. Gen. 410 and in earlier decisions therein cited.
“Pursuant to such authority this agency has issued an administration regulation directing that overtime service of less than 15 minutes will be disregarded. Furthermore, the regulations do not provide that periods of less than 15 minutes will be aggregated for the day.
“Since the periods of service were less than 15 minutes the employees do not have any service that may be recognized as overtime work.”

 The petition herein was filed May 13, 1968. The parties agree that the “claim period” involved extends from May 13, 1962, to December 15, 1965.

 The latter claim is that 10 minutes’ “early reporting” on the ward was required except on the midnight to 8:00 a.m. shift, where, it is asserted, there was a 15 minutes’ “early reporting” on ward requirement.

 Plaintiffs contend for an “average” overtime, for both uniform changes and early reporting, of 30 minutes per day for one who worked from midnight to 8 :00 a.m., and of 25 minutes per day for one who worked on any other shift.

 See finding 11.

 E.g., from 6 :00 a.m. to 2 :30 p.m., 1:30 p.m. to 10:00 p.m., and 2 :30 p.m. to 11:00 p.m.

 Handbook for Fort Meade Nursing Assistants (Nursing Education, 1959) ; Handbook, Fort Meade Nursing Assistants (Nursing Education, 1962). In 1964, the Hospital issued an Orientation Fact Sheet for Nursing Assistants which stated, among other things, that “The eight hour period you work is your Tour of Duty.”

 Plaintiffs Rave waived any claim related to early reporting on ward following December 15, 1905, the date the “uniform change” claim concededly ended.

 In addition to changing clothes, nursing assistants had to obtain from, or return to, their lookers various essential items of equipment (e.g., notebooks, pens, pencils, “seizure sticks,” or the like), and to be sure that they were indeed well groomed.

 Both the Chief Nurse and the Hospital Director should have been (and it is reasonable to Infer from the Tecord as a whole that both were) aware of the foregoing understanding and practice throughout the period here relevant. With a single exception, the Minutes quoted In finding 13(a) do not speak exclusively of the off-going “P.M. shift.” Moreover, in connection with early reporting, one of the Minutes specifically alludes to ‘‘the off-going tours * * (Emphasis supplied.) And, that nursing assistant plaintiffs in fact did ‘‘come on duty a little early” on the day and evening shifts, as well as on the midnight one, is plain.

 VA regulations in force from the beginning of the claim period to the June 14, 1965, revision similarly defined irregular or occasional overtime as “those hours of employment in excess of the 40-hour basic workweek, not scheduled in a regularly scheduled administrative workweek”, and “Regularly scheduled overtime” as “that overtime which would extend beyond two successive pay periods * * Such regulations further stated that regularly scheduled overtime would be authorized “only in unusual situations where special work outside of the normal and routine operations is required” ; that in such cases, for the groups of employees involved, a regularly scheduled administrative workweek consisting of the basic workweek, plus overtime, would be established; and that the “establishment of a regularly scheduled administrative work week which includes regularly scheduled overtime shall require approval by the department heads for field stations, * *

 VA regulations In force from the beginning of the claim period to the June 14, 1965, revision also granted to “Managers of field stations, or their designees * * *” authority to order and approve irregular or occasional overtime.

 Tie Hospital Director plainly conld not delegate to subordinates authority he himself lacked.

 Plaintiffs’ Brief, p. 2. The briefs of both parties in this case were filed prior to the court's decision in Bates v. United States, supra.

 Plaintiffs’ Brief, p. 13 (emphasis in original).

 Plaintiffs’ Brief, p. 16.

 5 C.F.R. § 25.221(b) (1961); 5 C.F.R. § 550.111 (1964).

 Cf. finding 2(b).

 Cf. finding 2(c).